No. 52,283

FARMERS STATE BANK AND TRUST COMPANY OF HAYS, KANSAS, *Appellee,* v. THE CITY OF YATES CENTER, KANSAS, *Appellant;* FIRST NATIONAL BANK AND TRUST COMPANY, EL DORADO, KANSAS, *Appellee;* UNION NATIONAL BANK, WICHITA, KANSAS, *Appellee.*

FIRST NATIONAL BANK AND TRUST COMPANY, *Appellee,* v. THE CITY OF YATES CENTER, KANSAS, A BODY POLITIC, *Appellant;* FARMERS STATE BANK AND TRUST COMPANY OF HAYS, KANSAS, *Appellee;* UNION NATIONAL BANK, WICHITA, KANSAS, *Appellee.*

(624 P.2d 971)

Opinion filed February 28, 1981.

*John R. Toland,* city attorney, argued the cause and was on the brief for appellant City of Yates Center, Kansas.

*Dennis L. Bieker,* of Dreiling, Bieker & Kelley, of Hays, argued the cause and was on the brief for appellee Farmers State Bank and Trust Company of Hays, Kansas.

*Franklin D. Gaines,* of Augusta, argued the cause and was on the brief for appellee First National Bank and Trust Company, El Dorado, Kansas.

*Richard A. Loyd,* of Jochems, Sargent & Blaes, P.A., of Wichita, argued the cause, and *Phyllis F. Wendler,* of the same firm, was with him on the brief for appellee Union National Bank, Wichita, Kansas.

The opinion of the court was delivered by

MILLER, J.: This is an appeal by the City of Yates Center from a judgment entered against it and in favor of the appellees, three Kansas banks, holders of temporary notes of the City which were "overissues." Farmers State Bank and Trust Company of Hays, Kansas, held two of the City's $50,000 notes, numbered 6 and 7, dated February 1, 1973; First National Bank and Trust Company of El Dorado, Kansas, held two of the City's $50,000 notes, also numbered 6 and 7 but dated September 1, 1973; and Union National Bank, Wichita, Kansas, held another of the City's $50,000 notes, this one being numbered 7 and dated September 1, 1973. The trial court entered summary judgment, whereby it allowed recovery by each bank of the amount it paid for the note or notes it held, plus interest at the rate fixed therein, from date of demand. The City raises numerous questions which we will state and discuss seriatim later in this opinion.

A statement of the facts and the history of this litigation is necessary to an understanding of the points raised. The first in the series of events leading up to the issuance of temporary notes by

the City of Yates Center occurred on October 7, 1971, when the City entered into a contract with the A. H. Speer Company of Wichita, by which Speer agreed to supervise the issuance of sewer improvement bonds to be issued by the City. Speer also agreed to engage a recognized bond attorney and to pay his fee, and to furnish blank bonds and bond register sheets ready for execution by the City. The City agreed to pay Speer 6% of the face amount of the bonds issued for his services. Thereafter, all of the matters relating to the issuance of temporary notes leading up to the issuance of the bonds were left in Speer's hands; the City Attorney was not consulted and no attorney was retained to represent the interest of the City. Unfortunately, Speer was not inclined to protect the interest of the City, and proved sadly lacking in trustworthiness.

Ordinance No. 694 authorizing the issuance of temporary notes was passed by the City Council on December 28, 1972. It created sewer districts within the City, authorized the construction of sewers therein, and authorized the issuance of temporary notes in an aggregate amount not exceeding $324,372.50, the estimated cost of the project. It provided that the temporary notes were to be issued as authorized from time to time by resolutions adopted by the governing body. On January 25, 1973, the governing body adopted a resolution, pursuant to ordinance No. 694, authorizing and directing the Mayor and the City Clerk to issue temporary improvement notes, sewer series, 1973, numbered from 1 to 7 inclusive, No. 1 being in the amount of $24,372.50 and the others to be in the amount of $50,000, all to be dated February 1, 1973, to bear interest at 5% per annum, to be payable to bearer, and to mature on or before February 1, 1977. Temporary notes Nos. 1 through 7 dated February 1, 1973, were executed by the Mayor and City Clerk and the City's official seal was affixed thereon. These notes were registered in the office of the State Auditor, and were placed in Speer's hands for sale as funds were needed. Temporary notes 1 through 5 were sold, the City received the proceeds, and no problem has arisen in connection with those securities. The First National Bank of El Dorado purchased temporary notes Nos. 2, 4 and 5 at par and accrued interest.

Speer contacted an officer of the First National in the summer of 1973 in an effort to sell notes 6 and 7. The officer indicated that interest rates had risen and the bank would not be interested in

acquiring the additional notes unless the interest rate could be increased to 6½%. Speer advised the City of this development and on September 6, 1973, the governing body of the City passed a resolution amending the resolution of January 25, 1973, and authorizing the issuance of temporary notes 1 to 5 as before, and further authorizing the issuance of temporary notes Nos. 6 and 7, dated September 1, 1973, payable to bearer, maturing on or before September 1, 1977, and bearing interest at 6½% per annum. The resolution further provided that temporary notes Nos. 6 and 7 issued under the resolution adopted January 25, 1973, "are hereby canceled and shall be surrendered to the State Auditor's office for cancellation prior to the registration of Temporary Improvement Notes Nos. 6 and 7 authorized herein." Notes 6 and 7 dated September 1, 1973, and bearing interest at 6½% per annum, were executed by the Mayor and City Clerk, the seal of the City was affixed, and the notes were placed in Speer's hands. These two notes were registered in the office of the State Auditor on September 6, 1973. Original notes numbered 6 and 7, dated February 1, 1973, were not canceled by the City officials and were not surrendered to the State Auditor's office as required in the resolution.

Speer then sold notes 6 and 7, dated September 1, 1973, and bearing interest at 6½% per annum, to the First National Bank for par and accrued interest, $100,325.

Next, and for what reason or upon what pretext we do not know, an additional note No. 7, dated September 1, 1973, and bearing interest at 6½% per annum, was executed by the Mayor and City Clerk, and the City's seal was affixed. That note was registered in the office of the State Auditor on November 13, 1973, and on the following day it was sold by Speer to the Union National Bank for par and accrued interest of $50,659.03. That amount was deposited in Speer's account by the Union National and Speer paid the City $47,668.06, being the face amount of the note and accrued interest less his 6% commission, on November 15, 1973. The City acknowledges that it received payment "for only one Note 6 and only one Note 7."

On August 21, 1974 (and for what purpose we do not know), the Mayor, the City Clerk, and A. H. Speer as "Fiscal Agent for the City of Yates Center, Kansas," executed an affidavit reciting the adoption of the resolution of September 6, 1973, amending the resolution of January 25, 1973, and further stating:

"that the Temporary Improvement Notes Nos. 6 and 7 issued under the Resolution adopted January 25, 1973, were at the time of the passage of the amending Resolution in fact cancelled by marking across the face of said Notes. That said cancelled Notes were in fact sent to Topeka along with the new Notes, which were to be registered, and that in fact said old Notes have never been issued and delivered and are in fact cancelled, nonexistent and of no force and effect."

These recitals were, of course, false. Over a year later, and on November 5, 1975, Speer sold notes 6 and 7, dated February 1, 1973, and bearing interest at 5% per annum, to Farmers State Bank for $98,330.

Litigation commenced on April 6, 1977, when Farmers filed suit against the City on notes 6 and 7 dated February 1, 1973. This action was case No. 77 C 11 in Woodson District Court. The City answered, setting up 16 separate defenses and asserting a counterclaim for interpleader.

First National filed suit against the City, being case No. 77 C 31, on June 28, 1977. This action was based on notes 6 and 7, dated September 1, 1973, which the First National held.

Also on June 28, 1977, the City made a motion that First National and Union National be made additional parties defendant in case No. 77 C 11. The Honorable Robert F. Stadler, to whom the case was then assigned, entered an ex parte order on that date, sustaining the City's motion, joining the First National and the Union National as additional parties defendant in the suit filed by Farmers, case 77 C 11, and ordering First National and Union National to respond to the petition filed by Farmers and to the counterclaim for interpleader filed by the City. Pleadings were filed by Union National and First National setting up their respective claims. On November 15, 1977, Judge Stadler consolidated cases numbered 77 C 11 and 77 C 31.

A great deal of discovery ensued; depositions of the Mayor, the City Clerk, and all the appropriate officers of each of the appellee banks were taken. Each of the banks filed a motion for summary judgment, and the City filed separate motions for summary judgment as against Farmers and Union National. These motions were argued before Judge Stadler; he died very suddenly without ruling upon them. The case was then assigned to the Honorable George W. Donaldson of the 11th Judicial District; the motions were argued before him, and on August 27, 1979, he issued a memorandum decision sustaining the motion for summary judg-

ment of each of the banks and overruling the City's motions, and stating that he expected to enter judgment on a later date when he could be in Yates Center. Thirty days later, and without entering judgment, Judge Donaldson retired. The Honorable John W. White, who had been appointed to the vacancy created upon the death of Judge Stadler, then heard oral argument on the motions and on March 10, 1980, filed his memorandum decision sustaining the motion for summary judgment of each of the banks and overruling the motions of the City. The journal entry incorporating the findings of fact and conclusions of law contained in the memorandum, and setting forth the specific judgments entered as to each of the banks, was entered on March 18 and filed April 15, 1980. This appeal followed.

Both Judge Donaldson and Judge White found that the City's counterclaim for interpleader was moot for the reason that all of the necessary parties were before the court for determination of their claims and defenses, First National and Union having been made additional parties defendant on motion of the City. This ruling is the target of the City's first claim of error. It contends that before any order for summary judgment could be entered, the trial court should first have ruled upon the City's counterclaim for interpleader and the court should have determined which note No. 6 and which note No. 7 are the contractual obligations of the City. The thrust of the City's counterclaim for interpleader, as observed by Judge White, was that the City admitted liability for two bonds only, a total of $100,000 plus accrued interest; the City desired to pay that amount into court as the "stake" and to be released from all further liability in this action, leaving the banks to litigate their respective rights to the "stake."

The City's obligation here stems from five separate temporary notes, all signed by the Mayor and City Clerk, all bearing the seal of the City, all registered with the State Auditor, and all reciting that the City is firmly bound "and its faith and credit and all real and personal property in said city are hereby pledged for the payment of this temporary improvement note and the interest thereon  .  .  .  ." Here there was no specific and fixed fund out of which the notes were payable; each temporary note is a "general obligation of the municipality issuing the same." K.S.A. 1980 Supp. 10-123. Each bank made claim based upon one or two specific temporary notes which it held in its portfolio; the banks did not make claims adverse to each other.

We considered the purposes of interpleader under our statute, K.S.A. 60-222, in the recent case of *Club Exchange Corporation v. Searing,* 222 Kan. 659, 664, 567 P.2d 1353 (1977). We said:

"[I]nterpleader is a joinder device whereby all of those who claim some interest in a particular fund (the stake) may be joined in the action, and may there assert and litigate their claims against the fund. Interpleader protects the stakeholder from multiple suits, and from determining at its peril the validity and priority of disputed claims; it also protects the claimants by bringing them together in one action so that a fair and equitable distribution of the fund may be made."

Unlike the facts in *Club Exchange,* there was here no fixed stake or fund which the claimants were to share; there was liability on the part of the City on two or more temporary notes in an amount not less than $100,000 nor more than $250,000, plus interest. There were no other actions pending or threatened; all parties interested were before the court in the one consolidated lawsuit. Further, the claims of the banks were not adverse; each claim was separately maintained upon a specific document or documents. The facts were not disputed, and had been fully developed through discovery; all that remained was for the court to determine the applicable law and apply it to the facts. At that stage of the proceedings the purposes of interpleader, as stated in *Club Exchange,* would not have been advanced by further considering the counterclaim for interpleader; the aims of interpleader had already been attained. As to the appropriateness of interpleader, we find this statement in 7 Wright & Miller, Federal Practice and Procedure: Civil § 1704, pp. 369-370 (1972):

"The primary test for determining the propriety of interpleading the adverse claimants and discharging the stakeholder (the so-called 'first stage' of interpleader) is whether the stakeholder legitimately fears multiple vexation directed against a single fund. Courts have expressed this standard with varying language, but most stress that the vexation and expense of possible multiple litigation warrants the use of interpleader . . . . Similarly, it is thought that the stakeholder should not be compelled to run the risk of guessing which claimant may recover from the fund."

The claimants were all before the court; there was no danger of multiple lawsuits; and the City was not required to guess as to the right of one or more banks to recover against it. That issue was before the court for decision as a matter of law. The trial court was correct in ruling that the claims for interpleader were moot.

The second point raised by the City is that it is not legally

obligated to pay "the three temporary improvement notes that are in excess of its legal authority to issue" and that the notes were not lawfully issued by the City and they were unlawfully registered by the State Auditor. There is no dispute but that the City intended to issue two temporary notes and now finds that five are outstanding. This is an "overissue," as contemplated by K.S.A. 84-8-104, which provides a remedy to the holders of overissue securities. The statute says:

"(1) The provisions of this article which validate a security or compel its issue or reissue do not apply to the extent that validation, issue or reissue would result in overissue; but

"(a) if an identical security which does not constitute an overissue is reasonably available for purchase, the person entitled to issue or validation may compel the issuer to purchase and deliver such a security to him against surrender of the security, if any, which he holds; or

"(b) if a security is not so available for purchase, the person entitled to issue or validation may recover from the issuer the price he or the last purchaser for value paid for it with interest from the date of his demand.

"(2) 'Overissue' means the issue of securities in excess of the amount which the issuer has corporate power to issue."

It is undisputed that the 5 notes were signed by the Mayor and City Clerk; the City's official seal was affixed; and the notes were registered with the State Auditor and bore his signature. Each appeared regular on its face. The trial judge ruled and the City accepts the characterization of 3 notes as an overissue. The City was not authorized to issue more than one note 6 and one note 7, since to do so would exceed the aggregate amount of the bonds which were to be issued to pay the cost of the project. See K.S.A. 1980 Supp. 10-123.

The City contends that the invalidity of the notes relieves it of contractual liability. However, K.S.A. 84-8-104 spells out the remedies of the holders of the overissued notes. There are two possible remedies—the City may issue an identical note which does not constitute an overissue, or the holder may recover from the City the purchase price of the notes plus interest from date of demand. Since the first alternative was not available—the City had no identical securities not constituting overissues—the trial court awarded judgment on the basis of the second alternative, purchase price plus interest on demand. This, we hold, was proper under the statute; although the notes constituted an overissue and were thus not valid securities, the purchasers were not left without a remedy.

The City contends that the overissue notes violate the cash basis law, K.S.A. 10-1101 *et seq.,* because they exceed the debt limitation. K.S.A. 10-1116 provides that the limits of indebtedness fixed by the cash basis law may be exceeded when provision has been made for payment "by the issuance of bonds as provided by law." The City argues that no provision was made or authorized for the issuance of bonds to pay the overissue notes. K.S.A. 84-8-202, however, fixes the responsibility of one issuing securities. It says:

"(2) (*a*) A security other than one issued by a government or governmental agency or unit even though issued with a defect going to its validity is valid in the hands of a purchaser for value and without notice of the particular defect unless the defect involves a violation of constitutional provisions in which case the security is valid in the hands of a subsequent purchaser for value and without notice of the defect.

"(*b*) The rule of subparagraph (*a*) applies to an issuer which is a government or governmental agency or unit only if either there has been substantial compliance with the legal requirements governing the issue or the issuer has received a substantial consideration for the issue as a whole or for the particular security and a stated purpose of the issue is one for which the issuer has power to borrow money or issue the security."

The latter section specifically imposes liability on a municipality when the security is in the hands of a purchaser for value without notice and the City has received "a substantial consideration for the issue as a whole," and a stated purpose of the issue is one for which the issuer has power to borrow money. The City of Yates Center received substantial consideration, over $300,000, for the issue as a whole, and the stated purpose is clearly one authorized by law. Further, overissues of securities of this nature would ordinarily exceed the limitations, and we conclude that the quoted sections of the UCC control even though they may conflict with the earlier provisions of the cash basis law. Where there is a conflict between the provisions of two or more statutory sections, the latest legislative expression controls. *Mannel v. Mannel,* 186 Kan. 150, 153, 348 P.2d 626 (1960).

The City also argues that the City should be relieved of liability because the Attorney General approved the transcripts and the registration of the notes, and the State Auditor failed to require the surrender of original notes 6 and 7 before registering the September 1 notes. We grant that the State Auditor erred in registering the September 1 notes without having the earlier notes

numbered 6 and 7 presented and canceled. This argument, however, overlooks the fact that the City itself caused the issuance of each of the notes numbered 6 and 7; the Mayor and City Clerk executed them and placed them in the hands of Speer. We conclude that negligence on the part of the State Auditor does not excuse the City from liability.

The City contends that the banks are not entitled to rely upon the recitals contained in the overissued notes for the reason that the notes were not properly registered by the State Auditor. In addition to arguing that the State Auditor should not have registered notes 6 and 7 dated September 1, 1973, on September 6, 1973, because the earlier notes were not submitted for cancellation at the same time, the City argues that there could have been no transcript authorizing the issuance of the note 7 dated September 1, 1973, which was registered on November 13, 1973, because there were no separate resolutions or other proceedings by the City authorizing its issuance. The resolution of September 6, 1973, authorized the issuance of a note 6 and a note 7 dated September 1, 1973. A transcript of those proceedings would show authorization for both notes. Nothing in the record shows whether one or more transcripts were prepared. K.S.A. 10-123 (since amended) provides that temporary notes should be in the form usual for bonds; this requires a recital in the notes of the authority under which they are issued and that they are issued in conformity with the provisions, restrictions and limitations thereof, and that the notes and the interest thereon are to be paid by the municipality. K.S.A. 10-112 (since amended) provides that after bonds have been registered, these recitals "import absolute verity and shall be conclusive  .  .  .  that all proceedings and conditions precedent have been had and performed to authorize the issuance" of such notes. The City argues that the notes were not "duly registered," as that term is used in K.S.A. 10-112, for the reasons stated above. The notes, however, were submitted to the State Auditor, they were entered into the records in his office and the State Auditor's signature was affixed. Where bearer notes or bonds are concerned, there can be no duty on the part of the purchaser to look beyond the genuine signature of the registrar (now the State Treasurer) to determine if the person charged with registering the security did so properly and without negligence. Such a requirement would utterly destroy the negotiability of municipal notes and bonds in this state.

In the *City of Kanopolis v. Mountain,* 147 Kan. 322, 76 P.2d 803 (1938), the city brought action to recover and cancel a refunding bond of the city which it had entrusted to a bond broker, who breached his duty and delivered the bond to Mountain. The city had delivered the bond, executed by the city officials, to Booth, who took it to Topeka for registration, and later converted it to his own use. The city contended that the bond was not a complete and valid instrument when it was entrusted to Booth. Chief Justice Dawson, speaking for a unanimous court said:

"This contention is essentially a challenge of the long-established rule of 'estoppel by recitals' which has given credit and marketability to Kansas municipal bonds, and to those of the country in general for the last sixty years, at least. . . .

. . . .

"It was argued that the bond was negotiated to defendant by Booth before it was a completed instrument, and likewise without authority, consequently it was not a valid instrument in the hands of this defendant. But that argument would cast on defendant the responsibility of inquiring whether the recitals in the text of the instrument and in the certificates of the city clerk and the state auditor were true. That duty cannot be required of one who accepts the bond for a lawful consideration without notice of infirmities—if indeed there had been any infirmities. He may implicitly rely on its recitals." (pp. 325, 328.)

The City next argues that the State Auditor's signature was unauthorized on the notes dated September 1, 1973, because the transcript called for the surrender and cancellation of the notes dated February 1, 1973, and those notes were not surrendered upon registration of the later issue; and the City reasons that therefore the purchasers were not entitled to rely on the recitals contained in the notes. K.S.A. 84-8-205 provides in applicable part that:

"An unauthorized signature placed on a security prior to or in the course of issue is ineffective *except* that the signature is effective in favor of a purchaser for value without notice of the lack of authority if the signing has been done by
"*(a)* [a] . . . registrar . . . or other person entrusted by the issuer with the signing of the security . . . ." (Emphasis added.)

The City argues that the State Auditor was not a person entrusted by the City with the signing of the notes. K.S.A. 10-123 required the notes to be registered in the same manner that bonds are registered. K.S.A. 10-108 (Corrick) required the City to furnish a transcript of the proceedings to the State Auditor and to register the bonds in that office; and the same statute required the

auditor, under seal of his office, to "certify upon said bonds the fact that they have been so registered." The signature and seal of the State Auditor was thus necessary before the bonds were complete and salable. The registration with the auditor and his certification was secured by Speer ostensibly at the behest of the City, after the City officials executed the bonds on behalf of the City. We conclude that the State Auditor was a "registrar" as that term is used in K.S.A. 84-8-205, and his signature was valid as to purchasers for value without notice of any infirmity in the transcript or lack of authority by the auditor. The purchasing banks paid substantial amounts for the bonds, and they had no notice of any defect or infirmity in the transcript or lack of authority by the State Auditor. The banks were therefore authorized to rely on the signature of the State Auditor, and on the recitals in the notes. The City is also estopped from denying the validity of the notes by K.S.A. 84-8-202 (2) (b), cited earlier in this opinion. In an early case involving recitals in bonds issued by a county, we said:

"Business is transacted and justice administered upon the presumption that private citizens and public officials are honest and faithful, and the presumption continues until the contrary is shown. This presumption, together with the negotiable quality of municipal bonds and the conclusiveness of recitals in them, greatly facilitates their sale and exchange and largely increases their value. Of course, officers cannot issue municipal bonds unless the law vests them with power to issue such bonds, and where there is no power officers cannot by recitals merely bind the municipality or estop it to deny the truth of the recitals. The general rule is, however, that if under any state of facts and circumstances there is lawful power in the municipality and its officers to issue bonds, they may, by recitals in the bonds, estop the municipality to deny the existence of the prerequisite facts and circumstances recited . . . ." *State v. Wichita County,* 62 Kan. 494, 498, 64 Pac. 45 (1901).

This general rule of law has been incorporated in principle in the UCC. See K.S.A. 84-8-202 (2); and see K.S.A. 10-112.

The City next contends that there were material issues of fact remaining for trial, and therefore the trial court erred in entering summary judgment pursuant to K.S.A. 60-256. We have held that where the record reflects that genuine issues of fact remain, summary judgment is not warranted even though both adverse parties moved for summary judgment. *Henrickson v. Drotts,* 219 Kan. 435, 438, 548 P.2d 465 (1976). Summary judgment is proper where the only question or questions presented are questions of law. In considering a motion for summary judgment, the party against whom the motion is directed is entitled to the benefit of

all reasonable inferences and doubts that may be drawn from the facts under consideration. And where genuine issues of material fact remain undetermined, the granting of summary judgment *is* improper. *Citizens State Bank v. Gilmore,* 226 Kan. 662, 663-664, 603 P.2d 605 (1979).

With these guidelines in mind, we now turn to those items which the City contends constitute unresolved issues of fact. The City first contends that it was a disputed issue as to "which note No. 6 and which note No. 7 are contractual obligations of the city." The factual background of each, however, is undisputed— the execution by Mayor and Clerk, the registration, and the facts surrounding the sale are all undisputed. Ruling upon the facts is a matter of law.

Are any of the notes void as a matter of fact or law? Again, the facts are undisputed; no additional facts or fact issues are suggested. The validity *is* a matter *of law, based upon the established* facts.

The City suggests that there are fact issues as to the genuineness of the notes; again, the signatures thereon are admittedly valid; the notes were all executed on behalf of the City and placed in Speer's hands. We see no fact issue.

The City suggests that the signatures on the notes are unauthorized; presumably this is based on the City's contention that the State Auditor was not authorized to register the later notes and sign them until the earlier notes were returned to the State Auditor and canceled. Again, the facts are undisputed; the signatures are genuine; whether the signatures were authorized is to be determined as a matter of law from the undisputed facts.

The City suggests that whether the banks were bona fide purchasers and holders of the notes is a fact issue. Again, there is no dispute about the facts leading up to the banks' acquisition of the various notes. The notes were purchased by the banks from Speer, whom the City employed to take care of the legal work, secure registration, and sell the notes. There is nothing on the face of the notes which would put the banks on notice of any defect, and the City does not dispute the evidence as to how the banks acquired the notes. Each paid Speer a substantial sum; First National and Union National paid par and accrued interest. Farmers was offered the 5% notes, and asked for a discount because interest rates had risen. Speer agreed to the requested

discount. Nothing was said about accrued interest, and Farmers did not know that the notes were issued in 1973 (it bought them in 1975) until after the purchase was completed. "Bona fide purchaser" is defined by K.S.A. 84-8-302 as:

"[A] purchaser for value in good faith and without notice of any adverse claim who takes delivery of a security in bearer form  . . . ."

Whether the banks were bona fide purchasers is a question of law based upon the undisputed facts.

Finally, the City claims that the failure of the banks to mitigate damages is an unresolved fact issue. The banks admitted that they took no steps to mitigate damages; the only question is whether they were legally obligated to do so.

Next, the City advances five additional reasons why the banks were not entitled to summary judgment. First, it contends that the trial court erred in entering summary judgment before the City's counterclaim for interpleader was determined. The trial court—both Judge Donaldson and Judge White—found the question of interpleader to be moot since all parties necessary to resolve the case were before the court. What we have already said in this opinion resolves this issue.

Second, it contends that Farmers was not entitled to summary judgment because Farmers' claim was not based upon contract. Farmers' petition, however, was based upon the notes it held. It sought to enforce the note as a contractual obligation and to collect par and accrued interest. Its motion for summary judgment was properly sustained.

Third, it complains that First National failed to comply literally with the provisions of Rule 141 (228 Kan. v [Adv. Sheet No. 2]). The First National adopted the briefs of the other banks in support of its motion for summary judgment. The law was the same as to all of the banks' motions for summary judgment; and although the facts were different, it is apparent that the City was familiar with the facts upon which the First based its motion. The City was not substantially prejudiced.

Fourth, the City claims that Union was not entitled to summary judgment because it had never asserted any independent cause of action and had only filed an answer to the City's counterclaim for interpleader, as directed by Judge Stadler's ex parte order. That answer, though not denominated as a cross-claim or otherwise, set forth Union National's claims against the City and asked that

its note be declared a valid obligation of the City. This would appear to set forth a statement of the claim showing that the pleader is entitled to relief, and a demand for judgment. See K.S.A. 60-208. We find no error.

Fifth, the City complains because the trial court entered summary judgment upon some theory other than the contract theory upon which the banks were seeking relief. The trial court entered judgment for each of the banks for the sum each paid for the note or notes it held, plus interest at the contract rate from date of demand. The judgment was based on the overissue statute discussed above, K.S.A. 84-8-104 (1) (*b*). This resulted in a much lower net judgment against the City than would have been the case had the court entered judgment for the face amount of the notes plus accrued interest. The City benefited and was not deprived of any defenses. The banks have not cross-appealed; the judgment was proper.

Next, the City complains of the 25-page memorandum decision entered by Judge White, contending that he did not make adequate findings of fact and conclusions of law. We disagree. The memorandum sets forth at length the undisputed facts and then states the controlling law which guided his decision. It is ample to advise the parties and the appellate court of the reasons for the decision, and amply complies with K.S.A. 60-252(*a*) and Rule 165 (225 Kan. lxxii).

The City contends that the holders of three of the notes had a duty to mitigate their damages. This contention is premised on the City's contention that three notes are void and thus the holders had an obligation to minimize their damages. The City notified Farmers and First National that there were *conflicting claims* as to notes 6 and 7 and that each bank should file a claim in the liquidation proceedings of the Speer Company, where they might secure partial compensation. Obviously, Speer breached his contract with the City; whether the City made claim in the liquidation proceedings is not disclosed by this record. Each bank, however, purchased a specific note or notes from Speer; he delivered properly executed and registered bearer notes to each purchaser; prior to a determination that its note or notes were invalid, the banks were in no position to make claim against Speer, and had no duty to do so.

The City contends that Farmers is not a bona fide purchaser for

the reason that it did not pay accrued interest in 1975 when it purchased notes Nos. 6 and 7 dated February 1, 1973. As we noted earlier, Farmers had no knowledge of the issue date of the notes when the purchase was agreed upon; Speer merely stated that he had two notes which he wished to sell, and the bank agreed to purchase them if Speer would discount them so as to give the bank a return of 6½% on its investment. This Speer agreed to do. Farmers did not know of the issue date until after the notes had been delivered and paid for. The discount procedure is common practice and is not evidence of bad faith on the part of the bank.

K.S.A. 1980 Supp. 84-1-201 (25) defines notice to a person as received when:

"(a) he has actual knowledge of it; or

"(b) he has received a notice or notification of it; or

"(c) from all the facts and circumstances known to him at the time in question he has reason to know that it exists."

K.S.A. 1980 Supp. 84-1-201 (27) defines notice to an organization as follows:

"Notice, knowledge or a notice or notification received by an organization is effective for a particular transaction from the time when it is brought to the attention of the individual conducting that transaction, and in any event from the time when it would have been brought to his attention if the organization had exercised due diligence. An organization exercises due diligence if it maintains reasonable routines for communicating significant information to the person conducting the transaction and there is reasonable compliance with the routines. Due diligence does not require an individual acting for the organization to communicate information unless such communication is part of his regular duties or unless he has reason to know of the transaction and that the transaction would be materially affected by the information."

Under these standards, it is apparent that the bank had no notice of any irregularity at the time it purchased the notes. Had the notes been purchased directly from the City, then the bank would have been required to pay par and accrued interest by K.S.A. 10-123; no such requirement exists when notes are purchased from an individual owner. The notes themselves and Speer's method of selling them had every appearance of validity and regularity. The bank qualifies as a bona fide purchaser for value without notice. See K.S.A. 84-8-302.

Lastly, the City claims that Union National was not a bona fide purchaser without notice for the reason that the legal opinion

approving note No. 7 was dated September 14, 1973, and states that the writer personally examined the note and finds that it was registered with the State Auditor, while the note was not actually registered with the State Auditor until November 13, the day before Union National purchased it. That the attorney's opinion predated the registration of the note with the State Auditor was an irregularity, but under the statutes defining notice cited above we do not believe that it was sufficient to put the bank on notice that anything was amiss. The trial court found that the bank was entitled to rely on the recitals on the face of the note, K.S.A. 10-112. We agree. The note was regular on its face, it was signed by the proper City officials and had the City's official seal on it, and it *had* been registered with the State Auditor at the time of purchase. Union National's action in purchasing the note was reasonable and it qualifies as a bona fide purchaser for value without notice, under the statutory definition.

In summary, the City caused all five temporary notes to be executed, issued, and registered with the State Auditor; it placed them in the stream of commerce by placing them in the hands of Speer for sale. Speer was unfaithful to his trust and sold the overissued notes instead of destroying or canceling them. He breached his contract with the City and committed fraud upon it. The banks, however, had no notice of Speer's wrongdoing at the time each purchased notes from Speer. The City set the scene; it placed the notes in commerce; it failed to make certain that notes Nos. 6 and 7 dated February 1, 1973, were canceled before it issued notes Nos. 6 and 7 dated September 1, 1973; and for some reason not disclosed by the record, its officials executed and delivered to Speer a second Note No. 7 dated September 1, 1973. To hold that the banks had notice of defects under the facts and circumstances disclosed by this record would severely hamper the sale and destroy the negotiability of municipal securities in this state. The trial court did not err in holding the City liable, and fixing the recovery of each bank pursuant to K.S.A. 84-8-104(1) (*b*).

We have carefully considered each point raised, and find no error.

The judgment is affirmed.