(680 P.2d 913)
No. 55,714

THE CONTINENTAL INSURANCE COMPANY, *Appellant,* v. MICHAEL B. ENTRIKIN, DAVID D. COPAS, ROBIN S. COPAS and PATRONS MUTUAL INSURANCE ASSOCIATION, *Appellees.*

Opinion filed April 19, 1984.

*Barry W. McCormick,* of Payne & Jones, Chartered, of Olathe, for appellant.

*David A. Hanson,* of Glenn, Cornish, Hanson & Karns, Chartered, of Topeka, for appellees David D. Copas, Robin S. Copas and Patrons Mutual Insurance Association.

*John M. Solbach,* of Lawrence, for appellee Michael B. Entrikin.

Before REES, P.J., ABBOTT and PARKS, JJ.

ABBOTT, J.: This is an appeal in a declaratory judgment action filed by The Continental Insurance Company (Continental) to determine its obligation under an automobile liability insurance policy, if any, to its insured, Michael B. Entrikin. The trial court held that when the underlying accident occurred the automobile being driven by Entrikin was covered as a replacement vehicle for the one described in the automobile liability insurance policy issued by Continental to Entrikin.

Continental appeals, raising two issues. It contends material issues of fact remain in dispute thus summary judgment should not have been granted, and that the trial court erred in finding there is coverage under the policy.

The salient facts are that Entrikin insured a 1966 Mercury Comet with The Continental Insurance Company for a period commencing December 27, 1979, through December 27, 1980. On September 11, 1980, Entrikin purchased a 1965 Chevrolet Malibu. He intended to "fix up" the Malibu over the winter and eventually dispose of the Comet. Entrikin maintains the Comet became inoperable and he commenced driving the Malibu. Continental contends a factual dispute remains as to whether the Comet was inoperable when the underlying accident occurred. We deem that question immaterial (as did the trial judge).

On November 13, 1980, Entrikin sold the Comet to a third party. Entrikin was paid in full for the car; he gave a bill of sale and possession to the third party and never again had possession of the Comet. He did not deliver title to the purchaser until February 1981, some six weeks after the underlying automobile accident.

Continental was not notified of the acquisition of the Malibu until after the underlying accident. The Malibu replaced the Comet as Entrikin's primary means of transportation from November 13, 1980, if not prior thereto, and remained his primary means of transportation until it was demolished in the underlying automobile accident on December 14, 1980, while being driven by Entrikin. While the Comet was inoperable and prior to selling it, Entrikin removed the license tag and placed it on the Malibu. He did not register or license the Malibu, nor did he have it inspected.

As a result of the accident, Entrikin was sued in a separate

action by David D. and Robin S. Copas and Continental filed this declaratory judgment action. Some discovery was had and both parties then filed motions for summary judgment. The trial judge denied Continental's motion and granted defendant's.

The trial court reviewed the insurance policy issued to Entrikin and correctly noted that the issue was whether the Malibu replaced the Comet, which was shown as the insured vehicle in the insurance declarations. In granting summary judgment to defendants, the trial court reasoned:

"The plaintiff asserts that the issue then is whether or not Mr. Entrikin owned two vehicles on the date of this accident. If so, it argues there is no coverage on the 1965 Chevrolet because it was not listed as a covered vehicle on the Declarations page of the policy.

"To refute this contention, the defendants argue that Mr. Entrikin divested himself of ownership of the 1966 Mercury listed on the policy in November of 1980. Mr. Entrikin further argues that he sold the 1966 Mercury Comet to Mr. Martin on November 13, 1980. At that time, he delivered possession of the vehicle to Mr. Martin and received $275 in cash.

"The Court concludes that Mr. Entrikin remained the owner of the 1966 Mercury Comet in the absence of a valid assignment of the Certificate of Title at the time of the purported sale. This was because of the force and effect of K.S.A. 8-135(c)(7), which provides in substance that failure to pass an assignment of a Certificate of Title within 15 days after the delivery renders a sale of a vehicle fraudulent and void.

"Our case law has held that this statute is to be strictly construed and enforced; and that failure to comply with its provisions defeats the passage of title. Not only is the sale void, but title remains in the seller. The Court further concludes, however, that the number of vehicles is not the determinative issue. Under the facts of this case, an insurance company is authorized under K.S.A. 40-3107 to designate by explicit description or appropriate reference all vehicles, whether it be one or more, to which coverage applies and to state the premiums charged therefor. Plaintiff prepared its own insurance policy and assured liability coverage to Mr. Entrikin on 'any auto.' Even in its definition of 'covered auto,' the policy designates numerous classifications of vehicles.

"The plaintiff's argument that the 1965 Chevrolet should not be considered a replacement vehicle since Mr. Entrikin admitted sale of the 1966 Comet was technically void based upon the strict construction of K.S.A. 8-135(c)(7), does not wash under the facts presented. Its authorities may be convincing on that point. For the purpose of argument, it admits that in the light of the technical statutory requirements and strict construction, it still insured the 1966 Comet and would have covered any accidents the new buyer, Matthew Martin, might have been involved in, but that is not the issue here. Even if the admitted sale of the 1966 Comet was technically void due to the nonassignment of title within 15 days, this does not preclude Mr. Entrikin from having coverage for his operation of the 1965 Chevrolet. It is undisputed that the 1966 Comet broke down and was taken out of normal use, at which time Mr. Entrikin attempted to sell it and actually

gave up possession and all the use thereof. Even if Mr. Entrikin retained title to the 1966 Comet, nothing prohibits or prevents him from having coverage for his use of the 1965 Chevrolet, which according to his testimony, replaced the 1966 Comet as his primary means of transportation. He had ceased his normal use of the 1966 Comet due to its breakdown and he subsequently attempted to sell it and actually gave up possession to the buyer. He then put the 1965 Chevrolet into driveable condition and began driving it, substituting its use for that of the 1966 Comet, as his primary means of transportation. The 1965 Chevrolet was a private passenger auto which he acquired during the policy's life. The Court concludes he did not have to notify the plaintiff or ask the plaintiff to insure the 1965 Chevrolet since its use replaced the 1966 Comet and he did not want . . . collision coverage on the 1965 Chevrolet. Thus, the 1965 Chevrolet came within the automatic coverage as a replacement vehicle. This policy does not specify any peculiar meaning or definition for the word 'replaces,' nor are there any other special conditions for the replacement vehicle coverage to become effective. There is nothing in the policy, or even in the ordinary meaning of the word 'replaces' which required Mr. Entrikin to convey clear and perfect title to the 1966 Comet in order for the 1965 Chevrolet to qualify as its replacement. If the plaintiff was going to require such strict compliance with the title transfer regulations and impose such technical qualifications on the replacement vehicle coverage, it should clearly have stated the same in the policy."-

Continental conceded at oral argument that if title to the Comet had been transferred to the purchaser prior to the accident, or if the Comet had been inoperable, the Malibu would have been covered as a replacement vehicle when the underlying accident occurred.

The pertinent part of the insurance policy reads:

" 'Your covered auto' means:
   (a)  Any vehicle shown in the Declarations.
   (b)  Any of the following types of vehicles of which you acquire ownership during the policy period, provided that you ask us to insure it within thirty days after you become the owner:
      (1)  a private passenger auto.
      (2)  if not used in any business or occupation, a pickup, panel truck, or van.
If the vehicle *replaces one* shown in the Declarations, you have to ask us to insure it within thirty days only if you wish Damage to Your Auto Coverage to apply to the replacing vehicle." (Emphasis supplied.)

Kansas addressed the issue of what constitutes a replacement vehicle in *Continental Casualty Co. v. Employers Mut. Casualty Co.*, 198 Kan. 93, 422 P.2d 560 (1967). There, the insured owned two vehicles, a 1958 Cadillac and a 1957 Oldsmobile. The insured purchased a third auto, a 1962 Chevrolet. The insured transferred his license tag from the Cadillac to the Chevrolet, but

retained possession of the Cadillac. He instructed an agent of Employers Mutual that he did not want the Chevrolet covered under its policy because his new employer's insurance company was going to cover it under a different policy.

The insured had a wreck in the Chevrolet and a declaratory judgment action was brought to determine which insurance carrier had primary coverage. The facts were stipulated to and a question of law was presented on whether the Chevrolet *replaced* the Cadillac. The Supreme Court stated:

"In the absence of evidence that the word 'replacement' had a meaning peculiar to the insurance field or that the parties intended any different meaning in the automobile liability policy, the usual and ordinary meaning of the term, *that is, to provide or produce a substitute or equivalent in place of a person or thing*, would govern. (*Nationwide Mut. Ins. Co. v. Mast, et al.*, 52 Del. 127, 153 A.2d 893 [1959].)

"A clear case of replacement occurs when disposition has been made of an old vehicle described in the policy, and a new vehicle of equivalent use is substituted.

"Other jurisdictions have considered the question under varying factual situations. A proposition generally supported is that a vehicle is a replacement if procured after issuance of the policy, and there has been a disposition of the vehicle described in the policy or the vehicle described in the policy has become inoperable.

"In the case of *Maryland Indemnity v. Steers*, 221 Md. 380, 157 A.2d 803 (1960), the insured owned an Oldsmobile which was listed as the insured vehicle. The Oldsmobile became inoperable, and although the insured acquired new license tags for it with the expectation of repairing it, the auto was eventually dismantled without having been repaired, and the insured acquired a Dodge which he later sold to acquire the Ford with which he had an accident. The court held since the Oldsmobile was actually inoperable when the Dodge was acquired, the Dodge was a replacement for it, and since the Ford replaced the Dodge, the insurer's liability was the same as if the Ford had replaced the Oldsmobile directly.

"In *Merchants Mutual &c. Co. v. Lambert*, 90 N.H. 507, 11 A.2d 361, 127 A.L.R. 483 (1940), the insured owned a 1930 Pierce-Arrow which was out of repair and not fit to be driven on the public highway. The insured then purchased a 1935 Pierce-Arrow and put it to the same use as the 1930 Pierce-Arrow. He did not dispose of or transfer the tags or registration from the 1930 automobile to the 1935 automobile. The court held that the 1935 automobile was shown by use alone to have replaced the 1930 Pierce-Arrow. In the opinion the court said:

" '. . . The language of the policy is to be construed in accordance with the principle that "the test is not what the insurer intended its words to mean, but what a reasonable person in the position of the insured would have understood them to mean." *Watson v. Insurance Co.*, 83 N.H. 200, 202. We think it plain that any reasonable person in the position of the defendant Lambert would have

understood from the language set forth in the statement of facts, that when he purchased another automobile to replace the 1930 Pierce-Arrow, his insurance would automatically apply to the replacing automobile "as of the date of its delivery to him." The plaintiff, if it had seen fit, might have inserted a provision that the insurance should not attach to the replacing car until the insured had parted with the ownership and possession of the replaced car, but in the absence of any such provision in the policy, these factors of the situation were properly regarded by the trial court as indecisive.

" 'The finding of the court that the 1935 car "was purchased for the defendant Lambert's business to replace the 1930 car for the very same use previously made of the 1930 automobile" is fully sustained by the evidence and the conclusion that "the said policy covered the 1935 Pierce-Arrow sedan at the time of the accident" follows as a logical conclusion.' (p. 510.)

"The Washington Supreme Court in *National Indemnity Co. v. Giampapa*, 65 Wash. 2d 627, 339 P.2d 81 (1965), upon the particular facts before it, held there can be no replacement of the 'described automobile' with another vehicle so long as the described vehicle is owned by the insured and remains operable."

. . . . .

"The whole question is to be resolved by a determination of the intention of [the insured] at the time the 1962 Chevrolet was purchased. In this connection, the transfer of license plates is simply one of the factors which should be considered." 198 Kan. at 96-97, 98.

The Supreme Court held as a matter of law that the stipulated facts showed the insured *intended* to use the 1962 Chevrolet as an additional car, not a replacement. The controlling facts were that after the accident the insured's wife continued to *use* the 1958 Cadillac, the insured had refused insurance coverage on the 1962 Chevrolet, there was no provision in the insurance policy requiring that the Cadillac be licensed before it was covered and therefore the transfer of that car's tag to the Chevrolet was not controlling, the Cadillac was mechanically operable at all times, and the insured specifically chose to insure the Chevrolet under his employer's insurance policy.

The appellant here argues that summary judgment was improper because the *Continental Casualty* case requires a finding that the defendant had legally disposed of the Comet *or* that it was not in operable condition before there can be a finding that the Malibu was a "replacement." The basis of appellant's argument is that the *Continental Casualty* case cited *National Indemnity Co. v. Giampapa*, 65 Wash. 2d 627, 399 P.2d 81 (1965), and stated that the Washington Supreme Court, *"upon the particular facts before it,"* held there could be no replacement of the "described automobile" with another vehicle as long

as the described vehicle was owned by the insured and remained operable. 198 Kan. at 97.

We do not read *Continental Casualty* so strictly. To us, it holds that the term "replacement" should be defined by its usual and ordinary meaning, "to provide or produce a substitute or equivalent in place of a person or thing," in the absence of evidence that the parties intended a different meaning. 198 Kan. at 96. Our Kansas Supreme Court stated that a *clear case* of replacement occurs when disposition has been made of the old vehicle, and a proposition supported generally by cases *in other jurisdictions* is that a vehicle has been replaced if it has been disposed of or it has become inoperable. The Court then cites three cases from foreign jurisdictions which, when analyzed, appear to be based on the facts of each case, including the insured's *use* of the replaced car and his intent to replace the disabled vehicle. The last of these three cases relied on by the Supreme Court is the Washington case of *Giampapa*, which the appellant claims requires a finding that a car is not replaced if it is still legally owned. We disagree. If the court in *Continental Casualty* had intended to adopt the rule argued by appellant, it could have ended its discussion at that point with a finding of no replacement, because the insureds still legally owned the Cadillac and it was mechanically operable. See 198 Kan. at 98. The *Continental Casualty* court, however, refused to apply this rule and instead went over the facts of the entire case to determine the *intent* of the insured to "replace" the Cadillac.

*Giampapa*, relied on here by the appellant, was *not* decided on who legally owned the replaced car but on the premise that the replaced car was inoperable. *Giampapa*, in making the statement quoted in *Continental Casualty*, was merely stating an old rule of law cited from *Mitcham v. Travelers Indemnity Co.*, 127 F.2d 27 (4th Cir. 1942). When the "replacement" clauses in insurance contracts were first being construed, *Mitcham, upon the facts of the case,* adopted the rule that a new car did not replace the one described in the insuring agreement if the insured still had *possession and use* of the old car, and retained title and *full control* over it. 127 F.2d 29. *Mitcham* has been widely cited and the test used there soon became shortened to whether the old car was disposed of or was inoperable.

This rule was criticized by many courts and it soon became

apparent that such a strict rule could not be followed. It also soon became apparent that each case must be decided on its own facts.

"The character of a newly acquired automobile as a replacement for the originally covered automobile involves a consideration of significance of title to the respective automobiles; the effect of continued possession and the condition of the original automobile; the kind of intended use and the actual use of the new automobile." 12 Couch on Insurance 2d § 45:209, p. 497 (rev. ed. 1981). See also 6B Appleman, Insurance Law and Practice § 4293 (1979).

The State of Washington, in applying its former decision in *Giampapa,* stated in *Rowland v. State Farm Mut. Auto. Ins. Co.,* 9 Wash. App. 460, 512 P.2d 1129 (1973):

"*National Indem. Co., v. Giampapa, supra,* supports the contention that no formal requirements are necessary for the automobile in question to be considered a 'replacement vehicle,' unless that term is defined in the policy. As noted by the trial court in its memorandum opinion:

"Various fact situations have developed criteria in cases of this nature. For instance, where one automobile has become inoperable and another purchased, a 'replacement' is taken to be proven. When one automobile is sold and another acquired,'replacement has been held to be proven. Such situations, however, merely present more compelling proof than in the present situation. Numerous other examples of proof of replacement status could be cited. For instance, if a new automobile is purchased and the one originally insured placed upon a lot for sale, or is advertised as for sale by the owner. These facts would tend to prove the intention to replace the one car by the other. . . . However, in any consideration of this problem, the ultimate question is *whether, in fact, the new car was intended to take over the functions of the old, and was the car originally named in the policy, put to some other use than when the coverage was originally obtained.*
(Italics ours.)

"As noted in 12 G. Couch, *Insurance* § 45:210 (2d ed. R. Anderson 1964), at 255:

"In some instances, the concept of replacement has been construed as a matter of intent rather than an actual replacement as to ownership. Thus the fact that the car described in the policy was retained by the insured and was in a legally usable condition has been held not to preclude transfer of coverage to a newly acquired car, where such car was actually purchased to replace the first car.

"The language of the insurance policy must be construed in accordance with the principle that it is not what the insurer intends its words to mean, but what a reasonable person in the position of the insured would have understood them to mean. *Cf. Glen Falls Ins. Co. v. Vietzke,* 82 Wash. 2d 122, 125, 508 P.2d 608 (1973).

"The narrow question presented is whether there is substantial evidence to support the trial court's finding that the 1970 Mazda was a replacement automobile. We find the evidence clearly supportive of the trial court's factual determination. The 1969 Datsun had been given to the daughter for her exclusive use in driving some 18 miles to and from a beauty school. This left Mrs. Rowland,

who worked, in need of transportation. The purchase of the Mazda was for her use and benefit. The insurance policy does not define what is meant by a 'replacement automobile.' Had the company wished to limit the word 'replaces,' as used in the policy, to situations where the old automobile was either mechanically unusable or no longer owned, it need only have inserted a provision in the insurance policy so defining the term. In the absence of such provision in the policy, the fact that the automobile was still mechanically operable and the owners had not totally divorced themselves from all incidents of ownership, was regarded by the trial court as indecisive of the issue. The trial court considered all of the factors surrounding the intent of the parties and determined the 1970 Mazda was purchased to replace the 1969 Datsun." 9 Wash. App. at 463-65.

In *Adams v. Covenant Security Insurance Company*, 465 S.W.2d 32, 35 (Mo. App. 1971), it was stated:

"In reaching this conclusion we have not overlooked arguments raised by the defendant insurer. It relies on an interpretation sometimes applied by the courts of other states and mentioned, but not applied, in Beck Motors, Inc. v. Federal Mutual Insurance Co., Mo. App., 443 S.W.2d 200. By that interpretation some courts say a newly acquired automobile replaces the automobile described in the policy only when the originally insured vehicle has become inoperable or has been disposed of. Certainly either of those two facts is strong evidence of an intent to replace, but we cannot say they are the only factors that can constitute a replacement. We reject that interpretation since it unduly restricts the definition of 'replace' and does violence to the principle of liberal interpretation in favor of an insured. Although we mentioned that strict interpretation in *Beck* we did not apply it, saying at l. c. 205: 'There may be other possibilities of treatment which would establish that the vehicle has been replaced.' We find those 'other possibilities' here."

To be a "replacement" vehicle, it is enough if the insured replaces *"in some real sense capable of proof,* the old automobile with the new." *Caldwell v. Allstate Insurance Co.,* 417 So.2d 1040, 1041 (Fla. Dist. App. 1982) (emphasis supplied).

"Replacement," then, can be determined *either* from the insured's intent in buying the car *or* by uncontroverted facts showing the old car was "replaced" under the common meaning of the term. This test is completely consistent with *Continental Casualty.* 198 Kan. at 96-99. In most cases the issue of replacement is one of fact for the jury. *Patterson v. Insurance Co. of North America,* 6 Cal. App. 3d 310, 317, 85 Cal. Rptr. 665 (1970). However, when only questions of law remain to be resolved, summary judgment is proper. *Farmers State Bank & Trust Co. of Hays v. City of Yates Center,* 229 Kan. 330, Syl. ¶ 7, 624 P.2d 971 (1981).

Under this test, the appellant's argument that the Malibu could

not be a "replacement" for the Comet merely because the defendant still legally owned the car until the title was found and transferred to the buyer is not persuasive; it is merely a factor to be considered. See 12 Couch on Insurance 2d § 45:210, and cases cited therein. Section 45:211 of Couch states: "The exact status of the title at a given moment is not significant in determining whether there has been a replacement of the original automobile. . . . *Abandonment of the use of the vehicle is the key* to a determination as to the significance of the status of the vehicle's certificate of title." (Emphasis supplied.)

The appellant's next argument that if the Malibu were covered under the policy as a replacement vehicle and the defendant still owned the Comet, there was a period when the defendant had two cars insured under a policy written on one car.

This argument is also not persuasive. The cases holding that the possibility the insurance policy will cover two cars when only one is described in the policy precluded a finding that the replacement car is covered cite specific policy language making it perfectly clear the insurance carrier intended to insure only one car—either the old one or the new, but not both. See *Mitcham,* 127 F.2d at 28.

The insurance policy here does not state clearly that only one vehicle is covered at a time; it could be read to cover a number of vehicles if they came within the definition of "covered auto." In *National Indemnity Company v. Aanenson,* 264 F. Supp. 408 (D. Minn. 1967), the United States District Court addressed this issue, stating:

"Plaintiff expresses concern that if automatic coverage attaches to a replacement vehicle before the owner of the replaced vehicle is separated from title thereto, it will be exposed to the risk of double coverage. Theoretically, no matter what point in time is chosen as the moment of replacement invoking automatic coverage, the insured will never be exposed to the risk of double coverage, since implicit in policy provisions for automatic coverage of replacing vehicles is automatic termination of coverage of replaced vehicles, whether or not a change in ownership of replaced vehicles occurs. See 7 Blashfield, Cyclopedia of Auto. Law & Prac., § 316.5 at p. 668; cf., Missouri Managerial Corp. v. Pasqualino, 323 S.W.2d 244 (Mo. App. 1959). Plaintiff, however, argues that as a practical matter it could not avoid double coverage, since it would not be able to prove the fact of replacement if the 1960 Cadillac were involved in an accident subsequent to the purchase of the 1958 Pontiac. . . . In any event, the Court feels that it need not be concerned with any possible difficulty of proof of replacement on the part of plaintiff, since plaintiff could have protected itself by including an appropriate

definition of the term 'replaces' when it drafted the policy of insurance presently being construed by the Court." 254 F. Supp. at 411-12.

See also *Merchants Mut. &c. Co. v. Lambert,* 90 N.H. 507, 11 A.2d 361 (1940), 127 A.L.R. 483:

"A similar argument was rejected by the California Court of Appeals in *Dean v. Insurance Co.,* 24 Cal. App. (2d) 762, and the present argument cannot prevail because the acts enumerated therein as pre-requisites to the attachment of the insurance to the replacing car, are not required by the terms of the policy. The language of the policy is to be construed in accordance with the principle that 'the test is not what the insurer intended its words to mean, but what a reasonable person in the position of the insured would have understood them to mean.' *Watson v. Insurance Co.,* 83 N.H. 200, 202. We think it plain that any reasonable person in the position of the defendant Lambert would have understood from the language set forth in the statement of facts, that when he purchased another automobile to replace the 1930 Pierce-Arrow, his insurance would automatically apply to the replacing automobile 'as of the date of its delivery to him.' The plaintiff, if it had seen fit, might have inserted a provision that the insurance should not attach to the replacing car until the insured had parted with the ownership and possession of the replaced car, but in the absence of any such provision in the policy, these factors of the situation were properly regarded by the trial court as indecisive." 90 N.H. at 509-10.

See also *Maryland Indemnity v. Steers,* 221 Md. 380, 386, 157 A.2d 803 (1960).

The defendant sold the Comet and did not have possession or use of it after the date of sale. He used the Malibu as his primary means of transportation. The appellant argues that there is a question of fact remaining to be resolved as to whether the defendant actually gave up use and possession of the Comet after the sale, because defendant made the statement that he still had possession of the Comet after the accident. The defendant, however, testified that the statement was intended to convey that he still had the *title* to the Comet. He not only did not admit physical possession after the sale, he denied it. The appellant presented no further evidence that the defendant had use or possession of the Comet after its sale. Before defendant sold the Comet, he removed the license tag and put it on the Malibu. The title to the Comet was eventually found and transferred to the buyer.

The trial court's duty in considering motions for summary judgment is known to the bench and bar of this state and need not be repeated. *McAlister v. Atlantic Richfield Co.,* 233 Kan. 252, 662 P.2d 1203 (1983). The only evidence Continental relies on that it claims is disputed is whether the insured owned the

Comet at the time he had the accident in the Malibu and whether it was in operable condition at the time of the sale. A resolution of the disputed evidence in favor of Continental would not change this opinion in light of the remaining uncontroverted facts of this case, which provide overwhelming evidence that the Comet was "replaced" within the common meaning of that term. We find no reversible error.

Affirmed.