No. 54,630

R. A. NELSON, M.D., *Plaintiff-Appellant,* v. VERN MILLER, *et al., Defendants-Appellees,* and FRED W. PHELPS, *Counterclaimant and Third Party Plaintiff,* v. R. A. NELSON, M.D. and JERRY K. LEVY, *Counterdefendant and Third Party Defendant.*

(660 P.2d 1361)

Opinion filed March 26, 1983.

*Jerry K. Levy,* of Jerry K. Levy, P.A., of Topeka, argued the cause and was on the brief for the appellant.

*J. H. Eschmann,* of Ascough, Bausch, Eschmann, P.A., of Topeka, argued the cause and *John A. Bausch,* of the same firm, was with him on the brief for the appellee Vern Miller.

*Charles L. Davis, Jr.,* of Davis, Unrein, Hummer & McCallister, of Topeka, argued the cause and James K. Keller, of the same firm, was with him on the brief for appellees, Adler, Barish, Daniels, Levin & Creskoff, a partnership.

*Thomas L. Theis,* of Sloan, Listrom, Eisenbarth, Sloan and Glassman, of Topeka, and *Alan V. Johnson,* of the same firm, were on the brief for appellee/cross-appellant Jerry K. Levy.

*Fred W. Phelps,* of Topeka, appeared pro se.

The opinion of the court was delivered by

HERD, J.: This is a lawsuit alleging malicious prosecution of a civil action. Plaintiff appeals from the trial court's order granting defendant's motion for summary judgment.

On April 1, 1976, a medical malpractice lawsuit entitled *Van Nover, et al. v. Wesley Medical Center, et al.,* was filed in Sedgwick County District Court. Attorneys for the plaintiffs in that action were Vern Miller; Fred Phelps, Chartered; and Adler, Barish, Daniels, Levin & Creskoff, a law firm of Philadelphia, Pennsylvania. The petition in that case alleged the Van Novers had been damaged by negligent treatment afforded Ms. Van

Nover and her child by the defendants, which included R. A. Nelson, M.D.

Dr. Nelson's attorney in the case was William Tinker, Sr., of Wichita. Mr. Tinker had been employed by the Medical Protective Company, Nelson's insurance carrier, with Nelson's knowledge and consent. Tinker felt strongly Dr. Nelson was not guilty of malpractice and thus attempted to get the case dismissed. At a hearing held September 29, 1977, Tinker requested the Van Novers' attorneys agree to a dismissal as to Dr. Nelson. Phelps and Adler, although wary of the prospect of a future lawsuit alleging malicious prosecution of a civil action brought by Nelson, consented. They also requested Tinker to waive the six-month limitation period for commencing a new action against Dr. Nelson contained in K.S.A. 60-518. The resulting order of dismissal read as follows:

"On September 29, 1977, counsel for all parties being present before the Honorable Howard C. Kline, Administrative Judge, the plaintiffs moved to dismiss without prejudice this action as to the defendant R. A. Nelson, M.D.

"Counsel for said defendant, R. A. Nelson, M.D., stipulated that if, after further discovery and for good cause, the plaintiffs would seek to re-join said R. A. Nelson, M.D. as a defendant herein, the bar of K.S.A. 60-518 would not be raised against such rejoinder if the same was sought to be made more than six months from the entry of this order of dismissal.

"Said motion to dismiss is sustained and said stipulation is accepted and,

"This cause shall be and the same is hereby dismissed without prejudice as to the defendant R. A. Nelson, M.D."

This order was filed October 10, 1977.

In the meantime, Dr. Nelson began looking into a possible lawsuit against the Van Novers' attorneys. Toward that end Nelson hired Jerry Levy on approximately July 6, 1977, "To look at the case and see if there was merit . . . ."

After extensive discovery, counsel for the remaining defendants in *Van Nover* filed motions for summary judgment. These motions were granted April 18, 1978, with respect to all remaining defendants. That summary judgment was later affirmed by the Court of Appeals in an unpublished opinion and a petition for review was denied. Opinion No. 50,109 filed June 29, 1979; *rev. denied* 226 Kan. 793.

Following the entry of summary judgment in the medical malpractice action Dr. Nelson filed an action in Shawnee County District Court against the present defendants who were the attorneys of record for the plaintiffs in *Van Nover, et al. v. Wesley*

*Medical Center, et al.* Nelson alleged malicious prosecution of a civil action and negligence. The defendants filed motions to dismiss which were sustained. Dr. Nelson appealed to this court, which overturned the dismissal of his claim for malicious prosecution of a civil action. In *Nelson v. Miller*, 227 Kan. 271, 607 P.2d 438 (1980), (*Nelson I*), this court pointed to the "scanty record" before the trial court at the time the motions to dismiss had been granted and remanded the case "to permit the parties to proceed with discovery so that the facts may be developed and the rights of the parties determined as to the plaintiff's claim for malicious prosecution of a civil action." 227 Kan. at 289.

After the opinion in *Nelson I*, Fred Phelps filed a counterclaim against Dr. Nelson and a third party petition joining Jerry Levy as an additional party defendant to the counterclaim against Dr. Nelson.

On remand the trial court held a hearing to determine the precise nature of the circumstances surrounding the dismissal of the Van Novers' original malpractice action. Afterward, the appellees herein again moved for summary judgment. The trial court sustained the motion, stating:

"Based upon the above findings of fact this Court can only conclude that the termination of the prior proceeding was not a favorable termination as is an essential element to an action for malicious prosecution under the circumstances of this case. Under the facts, the Court finds that the termination was indecisive as it was obtained pursuant to an agreement of compromise, Dr. Nelson having received and retained the full benefits of the agreement as set forth in the findings of fact. Under the findings of fact Dr. Nelson also obtained a dismissal by improper conduct on his part in not notifying counsel for the plaintiffs in the Van Nover case at the time of obtaining the dismissal that he intended to bring this action as soon as feasible and in fact, had retained counsel to do so.

"Therefore, there being no genuine issue as to any material fact as to the termination question, defendants are entitled to summary judgment thereon. Said termination was indecisive for the reasons stated in this decision, and not favorable to Dr. Nelson. Further, because favorable termination is an essential element to plaintiff's claim, defendants are entitled to summary judgment as a matter of law as to the entirety of plaintiff's suit herein."

Dr. Nelson has appealed.

This appeal is solely concerned with the propriety of the trial court's holding the dismissal of Nelson in *Van Nover v. Wesley Medical Center* was not a termination of the case favorable to Dr. Nelson. The larger issue divides into two parts: (1) Did the trial

court err in reexamining the favorable termination issue; and (2) are there genuine issues of material fact remaining unresolved?

Nelson first contends the trial court erred in reexamining the favorable termination question. Discussion of this issue requires a brief review of this court's opinion in *Nelson I.* As mentioned that case was an appeal from the trial court's order dismissing Dr. Nelson's petition against appellee. The record before the trial court consisted of four documents: (1) Dr. Nelson's amended petition; (2) the plaintiff's petition in *Van Nover v. Wesley Medical Center;* (3) the order dismissing the Van Novers' petition; and (4) the decision granting summary judgment to the remaining *Van Nover* defendants.

In its opinion in *Nelson I* this court first noted the elements a plaintiff must prove to be successful when alleging malicious prosecution of a civil action:

"(a) That the defendant initiated, continued, or procured civil procedures against the plaintiff.

"(b) That the defendant in so doing acted without probable cause.

"(c) That the defendant acted with malice, that is he acted primarily for a purpose other than that of securing the proper adjudication of the claim upon which the proceedings are based.

"(d) That the proceeding terminated in favor of the plaintiff.

"(e) That the plaintiff sustained damages." 227 Kan. at 276.

In discussing item (d), the court noted:

"Civil proceedings may be terminated in favor of the person against whom they are brought by (1) the favorable adjudication of the claim by a competent tribunal, or (2) the withdrawal of the proceedings by the person bringing them, or (3) the dismissal of the proceedings because of his failure to prosecute them. A favorable adjudication may be by a judgment rendered by a court after trial, or upon demurrer or its equivalent. Whether a withdrawal or an abandonment constitutes a final termination of the case in favor of the person against whom the proceedings are brought and whether the withdrawal is evidence of a lack of probable cause for their initiation, depends upon the circumstances under which the proceedings are withdrawn. Restatement [(Second) of Torts] § 674, comment j [1976]." 227 Kan. at 280.

After citing *Marbourg v. Smith,* 11 Kan. *554, *562-63 (1873), we held: "It is thus the law that a voluntary dismissal of the prior action without prejudice may be a termination in favor of the person against whom the action was brought." 227 Kan. at 281.

Later we reached the following conclusion:

"[T]he dismissal of the plaintiff's first claim based on the theory of malicious prosecution of a civil action was improperly granted. The allegations of the plaintiff's petition are set forth above. That petition clearly alleges the essential

elements of an action for malicious prosecution. It is clearly alleged that the defendant attorneys initiated and continued the prior medical malpractice proceeding against the plaintiff in Sedgwick County without probable cause and with malice and that the action terminated in plaintiff's favor on October 10, 1977, which was the day the action was dismissed without prejudice as against Dr. Nelson. . . ."

"[W]e reject the contention of the defendants that by procuring a stipulation and order of dismissal, Dr. Nelson is barred from bringing an action for malicious prosecution because there has been no termination in his favor. As noted above, a voluntary dismissal of the prior action without prejudice under Kansas law may be a termination in favor of the defendant in that action, if the action is not commenced again." 227 Kan. at 285-86.

Thus, the case was remanded to the trial court "to permit the parties to proceed with discovery so that the facts may be developed and the rights of the parties determined as to plaintiff's claim for malicious prosecution of a civil action." 227 Kan. at 289.

When seen against the background of *Nelson I* it becomes clear appellant's first issue is without merit. In *Nelson I* the court stated a dismissal without prejudice *may* be a termination in favor of the defendant in that action. Whether that dismissal is in fact a termination favorable to the defendant depends upon "the circumstances under which the proceedings are withdrawn." 227 Kan. at 280. Thus, the trial court on remand held a hearing to determine the facts surrounding Dr. Nelson's dismissal as ordered in *Nelson I*.

The favorable termination issue was not finally decided in *Nelson I*. The trial court acted properly in hearing evidence concerning the question.

Appellant next contends the trial court erred in granting summary judgment because several facts material to the favorable termination issue were controverted.

It is axiomatic summary judgment is not warranted where the record reflects genuine issues of fact remain. "Summary judgment is proper only if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Panhandle Agri-Service, Inc. v. Becker*, 231 Kan. 291, 295, 644 P.2d 413 (1982). Further, in considering a motion for summary judgment, the party against whom the motion is directed is entitled to the benefit of all reasonable inferences and

doubts that may be drawn from the facts under consideration. *Farmers State Bank & Trust Co. of Hays v. City of Yates Center*, 229 Kan. 330, 341-42, 624 P.2d 971 (1981).

The decision to dismiss the action against Dr. Nelson was made by the Van Novers' attorneys on September 29, 1977. A discovery conference was held in the office of Judge Howard C. Kline at which time the issue was discussed. The discussion was not recorded. Those present were William Tinker, Sr., attorney for Dr. Nelson and his insurance carrier; Fred Phelps, Sr., Avram Adler and David Rapp, attorneys for the plaintiffs; and Darrell D. Kellogg and Gerald L. Michaud, attorneys for the other defendants. What occurred at that meeting provides the evidence with regard to the circumstances under which the proceedings against Dr. Nelson were withdrawn. Out of this evidence must come the answer to the ultimate question of whether the proceedings were terminated in favor of Dr. Nelson. For the moment, however, an examination of the evidence also settles the issue as to whether summary judgment was proper.

Since Dr. Nelson is the party against whom the motion for summary judgment was made he is entitled to the benefit of all reasonable inferences from the evidence. It is thus unnecessary to discuss in detail the evidence supporting the trial court's holding the dismissal was a result of compromise. Nevertheless, we will present a brief summary of that evidence.

Mr. Adler of the Philadelphia law firm testified by affidavit Tinker told him the dismissal of Dr. Nelson would not be the basis for a subsequent lawsuit brought by Dr. Nelson. Adler said he agreed to the dismissal conditioned upon the right to reinstate the lawsuit within six months.

Mr. Rapp, in spite of having only a sketchy recollection of the meeting, testified he wrote a memo after the meeting which indicated Tinker had expressed his opinion the Van Novers had probable cause to file the original suit against Dr. Nelson.

Finally, Mr. Phelps testified he never felt the need to specifically ask Tinker if he was going to file suit on behalf of Dr. Nelson because of Tinker's "assurances." Phelps said that in response to a question regarding the possibility of Nelson filing suit he remembered Tinker answered, "He better not because he wouldn't have any case if he did." Phelps also testified he

would not have agreed to dismiss the suit had Tinker refused to waive the six month statute of limitation.

The evidence supporting Dr. Nelson's argument the dismissal was solely a result of the lack of evidence against him must be examined in more detail.

Mr. Tinker testified by affidavit:

"It was well known to all of the attorneys representing the Van Nover plaintiffs that in behalf of Dr. Nelson, I was insisting and maintaining that no facts had been developed or would be developed to establish any cause of action against Dr. Nelson. The Honorable Howard C. Kline, District Judge, had taken responsibility for the management of the case. At a hearing before him on September 29, 1977, counsel for all parties being present, I verbally restated a demand that Dr. Nelson be dropped from the case. Fred W. Phelps and A. G. Adler were personally present as attorneys for the plaintiffs. Darrell D. Kellogg and Gerald L. Michaud were personally present, representing defendants other than Nelson. David Rapp also was present for the plaintiff. The affiant had become acquainted with Mr. Adler at the taking in Philadelphia of the deposition of a Dr. Kalodner, listed as a plaintiff's expert witness. At the hearing before Judge Kline, Mr. Adler asked the affiant if I thought that Dr. Nelson would bring suit against him and the other attorneys for the plaintiffs when Dr. Nelson was dismissed from the case. It was evidence to all parties, and their counsel that no case had been made against Dr. Nelson and that the Court was likely to enter an order of dismissal as to Dr. Nelson. The affiant answered Mr. Adler's request by stating that he did not know whether Dr. Nelson would bring suit against the attorneys or not, adding that if Dr. Nelson did so, he would have other attorneys than the affiant.

. . . .

"At no time did the affiant state, represent, or imply that Dr. Nelson would not bring suit when he was dismissed from the Van Nover case. The affiant did not know and had not been consulted by Dr. Nelson in any way.

"After the affiant made the statement above referred to, to Mr. Adler, the plaintiffs' attorneys agreed to a dismissal by them, and entered in favor of Dr. Nelson. The plaintiffs' attorneys did then ask the affiant if a provision could be inserted in the Journal Entry to the effect that Dr. Nelson could be reinstated in the case if bonafide facts were developed later, and during the pendency of the Van Nover case against the other defendants. The affiant was sure that no such facts would ever be developed and agreed to the request."

## Darrell Kellogg also recalled the meeting by affidavit:

"The affiant recalls that at the beginning of the discovery conference, Judge Kline pressed plaintiffs' counsel as to whether or not they had any further evidence in their claim against Dr. Nelson and it was the affiant's impression that Judge Kline would probably have sustained a motion for summary judgment at that time. In any event, affiant remembers that plaintiffs agreed to dismiss the case and in a discussion before Judge Kline as to whether or not the case could be refiled, there was a statement by Mr. Tinker, Sr., that he would waive the six (6) months refiling in the event that plaintiffs ever were able to produce any evidence in support of plaintiffs' claim against Dr. Nelson. After that statement, Mr. Tinker, Sr. left the conference."

Finally, there is the following testimony by Mr. Phelps:

"Q. (By Mr. Levy) I said, as of September 29th, 1977, did you have one shred of evidence in any way, shape or form that Dr. Nelson did anything that caused any injury to the Van Nover child?

After a statement about Dr. Nelson prescribing Tussionex, Phelps stated:

"A. The evidence I had was that Dr. Romebach, as I recall it, not only identified Tussionex as far as the record went, but also said that the baby has probable or possible, or some language, brain damage.

"Now, that's the evidence we had going in, as I knew it, as of September the 29th. We had just taken Kalodner's deposition, and I understood, although I wasn't there, Adler and those guys took it, that he extricated Dr. Nelson; that is, he exonerated him. He didn't identify him as being the culprit, and that the deposition of Dr. Weber on September the 28th, as I understood it, although I wasn't there, tended to exonerate Nelson, and that the deposition of Dr. Romebach that morning were apparently, according to my information, I wasn't there, she kind of waffled.

"Now, that was what was confronting me, and I had no desire to continue to prosecute Nelson if all of our suspicions apparently had not panned out, and that's the reason that I agreed with him, with that caveat, that if further discovery reimplicated him that he would not raise the bar of the six months statute of limitations to being brought back into the case."

"Q. Well, isn't it true, sir, that before Dr. Kalodner was deposed, despite your remarks to the Court here this morning, that you had a report from him which in no way implicated Dr. Nelson?

"A. Well, Dr. Kalodner was not my expert. I have never seen him. The Adler firm was handling this litigation. I hired them to handle this because they're experts, and they hold themselves out to be in the field. They hired Dr. Kalodner. They had all the dealings with him. I never talked to him once.

"Now, I don't remember exactly what his written report said, whether it implicated Dr. Nelson or not. I know that the lawyers that I was relying on gave me full assurance that we had sued the right people and that at least up to that point Nelson still ought to be in that case.

"Now, what happened between that time and the time that Kalodner testified, I don't know, but my understanding after Kalodner testified was that we should no longer keep Nelson in the case, at least as far as his testimony was concerned."

Later Levy tried to pin Phelps down regarding the reason for Dr. Nelson's dismissal:

"Q. Well, you let him out because you had no evidence against him, didn't you Mr. Phelps?

"A. We let him out for the exact reasons I have told you: That he had been in 18 months, and the experts we were relying on had apparently exonerated him, and we had no desire to continue to prosecute the case against him in the face of his importunity, requesting that we let him out."

Phelps further attempted to explain how the appellant's attor-

neys were disappointed in the testimony of Dr. Romebach, an expert witness:

"Q. (By Mr. Davis) Mr. Phelps, you mentioned, you used the term in your testimony of waffle or waffled. I don't have a definition of that word. Would you tell us what you mean by that?

"A. I think I said that my understanding of Dr. Romebach's deposition, they brought her down there, and that is the doctor who apparently was working at Wesley at the time of the treatment of this child, and she now later was working at Menninger's, and so the defendants brought her to Wichita so they could get her deposition out of the way at their convenience while Mr. Adler was in town to take it on the morning of September the 29th, 1977.

"I wasn't there, and my understanding of it was that we were depending on her to show two things; first, that Tussionex was the suspicious causative agent for the convulsions or at least part of the baby's distress; and second, that her notation about him having brain damage would be enlarged upon, and my understanding is that she went back on that.

"By waffle, I mean she didn't come forth either strongly for, or she qualified and explained away the entries that were in the medical records about the Tussionex being the causative agent and/or cause of the brain damage.

"Q. Now, tell the Court please who that woman was by description.

"A. Well, maybe it's Jean. I forget her first name. Romebach is her last name. As I say, I wasn't there. I didn't hear her, but Adler had been talking to Tinker apparently about the results of it, and that was the basis for their conversation regarding letting Dr. Nelson out of the case at that stage. She was treating that baby.

. . . .

"Q. And did you not hear Mr. Adler say something to the effect that in view of her changing her testimony of his feeling that she had changed her testimony that he thought Dr. Nelson should then be dismissed from the case?

"A. Well, I can't say that I have an independent recollection of that. I'm trying to recall from my memory exactly the words.

"They were generally talking about those depositions that had been taken of Kalodner just a month before. Weber's was the day before and Romebach's that morning. I couldn't tell you that he didn't say exactly those words, Charles. I just don't have an independent recollection of that.

"Q. Do you remember Mr. Adler making some comment to the effect, since she gave different testimony than what he had expected that he was willing to recommend dismissing against Dr. Nelson?

. . . .

"A. I remember talking along that line. My only hesitancy is whether he specifically used the name Romebach at the time. At the time, he was talking about our expert, and it could have been Kalodner or Romebach as far as my independent present recollection goes."

From the foregoing it is clear there are two different versions of what happened at the September 29, 1977, meeting. Appellees argue the dismissal of the case against Dr. Nelson was the result

of a compromise reached that day. Indeed, there is evidence from which a jury could have found such was the case. If the dismissal was the result of compromise it was not a sufficient termination to meet the requirements of a cause of action for malicious prosecution of a civil proceeding. Restatement (Second) of Torts § 660(a); § 674, comment j (1976).

On the other hand, Dr. Nelson and his attorney argue the dismissal resulted from the appellee's realization they had no case against him. Again, there is evidence from which a jury could have found this to be the case. If so the dismissal would certainly have been a termination in favor of Dr. Nelson.

Clearly, the material facts regarding the question of whether the dismissal of the Van Novers' lawsuit against Dr. Nelson was terminated in his favor were in substantial dispute, particularly when viewed in the light most favorable to Dr. Nelson as required in considering a motion for summary judgment. As such, a question for the jury is presented. We hold the trial court erred in granting the appellee's motion for summary judgment.

The judgment of the trial court is reversed and the case is remanded for trial.

HOLMES and LOCKETT, JJ., not participating.

SCHROEDER, C.J., concurring. I agree with the foregoing opinion written for the court. The record reflects that while Dr. Nelson wanted to have the action against him dismissed, he did not at any time authorize William Tinker, Sr., who was employed by the Medical Protective Company, *Dr. Nelson's insurance carrier*, to settle the case on his behalf. This court has held a settlement by the insurer of a claim by a third person against the insured made without the insured's consent or against his protest of nonliability, and not thereafter ratified by him, will not ordinarily bar an action by the insured against the person receiving the settlement, on a claim arising out of the same state of facts. *Graves Truck Line, Inc. v. Home Oil Co., Inc.*, 181 Kan. 507, 312 P.2d 1079 (1957); *Lohman v. Woodruff*, 224 Kan. 51, 578 P.2d 251 (1978); Annot., 32 A.L.R.2d 937 and Later Case Service.