The **WOODMONT CORPORATION,**
Plaintiff,

v.

**ROCKWOOD CENTER PARTNERSHIP,**
et al., **Defendants.**

**Civ. A. No. 91–1465–MLB.**

United States District Court,
D. Kansas.

May 17, 1994.

---

Gary L. Ayers, Foulston & Siefkin, Wichita, KS, for plaintiff.

David M. Rapp, Hinkle, Eberhart & Elkouri, Wichita, KS, for defendants.

### *MEMORANDUM AND ORDER*

BELOT, District Judge.

This case comes before the court on defendants' motion for summary judgment, pursuant to Fed.R.Civ.P. 56. (Doc. 87).

This case arises out of the parties' aborted plans to develop a shopping center at the southwest intersection of Central Avenue and Rock Road in Wichita, Kansas. Woodmont Corporation (Woodmont) executed a Development Contract with Rockwood Center Partnership (Rockwood) on January 15, 1991, wherein Woodmont agreed to develop[1] property owned by Rockwood into a shopping center. Woodmont is a Texas corporation headquartered in Fort Worth, Texas.

Woodmont undertook extensive efforts to bring the project to fruition. It contacted dozens of potential lenders throughout the country, including Kansas, in an effort to secure financing[2] for the project. Rockwood

---

1. According to the contract, Woodmont was "responsible for all development activities including, but not limited to, design, construction and, obtaining without personal obligation therefore, financing (both interim and permanent) and coordination efforts to accomplish same."

2. Rockwood was seeking a loan of approximately $7.25 million to finance the project.

eventually signed agreements with Morrow and Company and Northland, two mortgage brokers, who agreed to attempt to obtain financing for the project. Northland arranged through Nationwide Life Insurance Company to make a loan commitment on the project, and sent Rockwood the proposed loan agreement. Rockwood made several changes to the proposed agreement that Northland deemed unacceptable. The financing for the project ultimately fell through. It is undisputed that neither Woodmont nor its representatives was registered as a loan broker under Kansas law.

In addition, Woodmont sought to obtain tenants for the proposed shopping center. It solicited tenants nationwide, both through its employees and through real estate brokers, and signed numerous leases for space in the shopping center. It is undisputed that no Woodmont employee possessed a Kansas real estate broker's license.

After the project fell through, Woodmont sued Rockwood and its partners for breach of contract, breach of fiduciary duty, misrepresentation, and defamation.[3] Defendants have moved for summary judgment.

### Standards for Summary Judgment

Rule 56(c) of the Federal Rules of Civil Procedure directs the entry of summary judgment in favor of the party who "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." A principal purpose "of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses...." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323–24, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). The court's inquiry is to determine "whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). Entry of summary judgment is mandated, after an adequate time for discovery and upon motion, against a party who fails to

make a showing to establish the existence of an element essential to that party's case, and on which that party bears the burden of proof at trial. *Meredith v. Beech Aircraft Corp.,* 18 F.3d 890, 893 (10th Cir.1994). Summary judgment is inappropriate, however, if there is sufficient evidence on which a trier of fact could reasonably find for the nonmoving party. *Prenalta Corp. v. Colorado Interstate Gas Co.,* 944 F.2d 677, 684 (10th Cir.1991).

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact by informing the court of the basis for its motion. *Martin v. Nannie and the Newborns, Inc.,* 3 F.3d 1410, 1414 (10th Cir.1993). This burden, however, does not require the moving party to "support its motion with affidavits or other similar materials *negating* the opponent's claim." *Celotex,* 477 U.S. at 323, 106 S.Ct. at 2553. (emphasis in original). Once the moving party properly supports its motion, the nonmoving party "may not rest upon mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Muck v. United States,* 3 F.3d 1378, 1380 (10th Cir.1993). The court reviews the evidence in a light most favorable to the non-moving party, *e.g., Thrasher v. B & B Chemical Co., Inc.,* 2 F.3d 995, 996 (10th Cir.1993), under the substantive law and the evidentiary burden applicable to the particular claim. *Anderson,* 477 U.S. at 255, 106 S.Ct. at 2513.

### Discussion

Defendants argue Woodmont's lawsuit is barred on three separate grounds. First, they contend Woodmont was not registered to do business in Kansas as required by K.S.A. 17–7301. (Doc. 88, pp. 47–51). Second, they contend Woodmont engaged in loan brokering activities as defined in K.S.A. 50–1001 *et seq.* without being registered. Third, they contend Woodmont's representatives engaged in real estate brokering without the required license. (Doc. 88, pp. 36–47).

---

3. In a previous order (Doc. 100), the court dismissed Woodmont's defamation claim.

*Doing Business in Kansas*

■ K.S.A. 17–7301 and 17–7302 require foreign corporations, before doing business in this state, to file an application in the Secretary of State's office for authority to engage in business in this state. *Panhandle Agri-Service, Inc. v. Becker*, 231 Kan. 291, 294, 644 P.2d 413 (1982). Foreign corporations that fail to comply and do business within the state may not maintain any lawsuit in the state.[4] K.S.A. 17–7307(a). The phrase "doing business in this state" is defined by K.S.A. 17–7303[5] and requires the establishment of an office or place of business within this state, or delivery of wares or products to resident agents in this state for sale, delivery or distribution. *Panhandle*, 231 Kan. at 294, 644 P.2d 413.

Defendants contend Woodmont has a place of business at 8235 E. Kellogg in Wichita, Kansas. A local directory lists this address (Eastgate office) as belonging to "Woodmont Property Management", a sister corporation of the plaintiff. Defendants point to the fact that meetings concerning the project were occasionally held at the Eastgate office, Woodmont's chief financial officer testified he treated various Woodmont entities almost as one company for accounting purposes, and Woodmont's construction manager testified that Woodmont employees worked at the Eastgate office when in Wichita if there is space available. In addition, Woodmont posted a sign on the Rockwood Center property advertising the prospective opening of the shopping center and giving a Wichita phone number on the sign. Woodmont responds that anyone who called the listed number was immediately transferred to Woodmont's offices in Texas.

■ The Kansas Supreme Court offers little guidance on what or how much activity is required to have an office or place of business in Kansas. This court is concerned that a broad interpretation of the statute could potentially infringe upon interstate commerce. Thus, the court agrees with other courts that have found that a foreign corporation's activities must be permanent, continuous, and regular in order to come within the statute. *See e.g., Storwal Intern. Inc. v. Thom Rock Realty Co., L.P.*, 784 F.Supp. 1141, 1144 (S.D.N.Y.1992).

In *United Arab Shipping Company v. Al-Hashim*, 176 A.D.2d 569, 574 N.Y.S.2d 743 (1991), the court construed a similar statute. In *Al-Hashim*, a Kuwaiti corporation, sued its former employees for breach of contract. The defendants asserted the lawsuit was barred because the Kuwaiti corporation did not have authority to do business in New York. The court found the Kuwaiti corporation had a New York office that employed 17 full-time employees, actively solicited business, conducted its own sales activities, and generated approximately $80 million in revenues. In the court's view, these facts established that the Kuwaiti corporation's activities were not merely casual but continuous, regular and systematic. *Id.* 574 N.Y.S.2d at 744. The court held the Kuwaiti corporation was barred from maintaining the lawsuit. *Id.*

■ In this case, the court finds defendants' evidence is insufficient to establish as a matter of law that the Eastgate office was Woodmont's office or place of business. Defendants attempt to lump together other Woodmont entities[6] and attribute their activities to the plaintiff. For example, it quotes the statement of Ronald Clinkscale, plaintiff's chief financial officer, to the effect that the Woodmont entities have one accounting department that treats the various Woodmont companies *"almost as one company."* Clinkscale's statement does not tend to show the Eastgate office is Woodmont's office or

---

**4.** If a corporate plaintiff is prohibited from maintaining an action in state court because of its failure to qualify, it is also barred from bringing a diversity suit in federal district court. *Associates Cap. Services v. Loftin's Transfer, Etc.*, 554 F.2d 188, 189 (5th Cir.1977).

**5.** K.S.A. 17–7303 provides:
    Every foreign corporation that has an office or place of business within this state, or a distributing point herein, or that delivers its wares or products to resident agents in this state for sale, delivery or distribution, shall be held to be doing business in this state within the meaning of this act.

**6.** Woodmont Realty Associates and Woodmont Property Management Company.

**952**

place of business. The mere fact that two or more corporations have a common owner does not, standing alone, justify a disregard of the separate identity of each of the corporations. *See Matter of Xonics Photochemical, Inc.*, 841 F.2d 198, 201 (7th Cir.1988). Related corporate entities may decide to centralize their accounting functions without subverting the independence of each corporation. Furthermore, defendants offer no explanation what is meant by Clinkscale's statement. Do the Woodmont entities have consolidated balance sheets, pay each other's debts, or file consolidated tax returns? The court declines to speculate about Clinkscale's meaning.

Defendants do not show that the Eastgate office was the focal point of Woodmont's activities in this case. Defendants freely admit that meetings took place at defendant Taylor's office, local restaurants, and hotel rooms. Defendants make no effort to apportion the amount of activity that took place at the Eastgate office relative to other sites. The testimony of James Bartee, Woodmont's construction manager, suggests it was not substantial. Bartee testified that Woodmont used the Eastgate office "*if* there is space available." The Eastgate office can hardly be deemed a "place of business" if Woodmont employees must inquire about its availability before conducting business at the office.

The court finds that defendants' evidence is insufficient to establish, as a matter of law, that Woodmont was doing business in Kansas as contemplated by K.S.A. 17–7303.

### Loan Broker

■ Defendants argue Woodmont engaged in loan brokering by meeting with numerous potential investment and/or financing sources for the project in Kansas. A loan broker is defined as a person who, in return for a fee, promises to procure a loan for any person or to *assist any person in procuring a loan from any third party.* K.S.A. 50–1001(c) (emphasis added). Woodmont agreed to do this in the Development Contract.[7] A loan broker is required to register with the securities commissioner

(K.S.A. 50–1002), and violations of the Act subject the violator to potential criminal sanction. K.S.A. 50–1013.

Woodmont admits that it was not registered but contends it was exempt from the Act's registration provision pursuant to K.S.A. 50–1016, which grants an exemption to "any person whose fee is wholly contingent on the successful procurement of a loan from a third party and to whom no fee, other than a bona fide third party fee, is paid before the procurement." K.S.A. 50–1016(c) says "successful procurement" means that a binding commitment from a creditor to advance money has been received and accepted by the borrower.

Woodmont relies on paragraph 11 of the contract, which provides:

FINANCING CONTINGENCY. The development of the property and matters related thereto, including payment of development fees to DEVELOPER, is contingent upon and subject to interim and permanent financing being obtained for the Project upon terms and conditions satisfactory to OWNER [Rockwood] not to be unreasonably withheld.

Development fees are defined in paragraph 6 of the contract. All the fees described therein are contingent upon successful financing.

Therefore, the court finds that Woodmont has met its burden to prove its exemption from the broker registration requirements of K.S.A. 50–1002.

### Real Estate Broker

■ Defendants argue Woodmont's suit is barred by the fact that Woodmont's employees engaged in real estate brokering without a license. Defendants have produced affidavits from four local business owners who discussed leasing space at the proposed shopping center with Scott Harrell, a Woodmont representative. Defendants have also produced a letter referring to a leasing commission agreement between Woodmont/Doppelt & Co. and Rockwood.

7. See footnote 1, *supra*. Section F.2 of the contract provides that Woodmont may, at its option, solicit mortgage brokers as part of Woodmont's duty to assist in obtaining financing.

The statute upon which defendants rely is K.S.A. 58–3038(a), which provides in relevant part:

[N]o action shall be instituted or recovery be had in any court of this state by any person for compensation for any act or service, the performance of which requires a license under this act, unless such person was duly licensed under this act at the time of offering to perform any such act or service or procuring any promise to contract for the payment of compensation for any such contemplated act or service.

The Act requires a broker to be licensed. K.S.A. 58–3036. K.S.A. 58–3035(f) defines a broker as an individual who, for compensation, engages in any of ten enumerated activities as an employee of, or on behalf of, the owner, purchaser, lessor or lessee of real estate. One of those enumerated acts is to negotiate, offer, attempt, or agree to negotiate the leasing of real estate. K.S.A. 58–3035(f)(3).

Woodmont does not deny that it was not licensed, nor does it deny that Harrell came to Wichita where he met with four Wichita business owners who were prospective tenants. Instead, Woodmont argues that: (1) most, if not all, of its leasing activity took place from its office in Texas and was not covered by Kansas licensing law; (2) its leasing activity was not "for compensation" and hence, it was not a "broker" under Kansas law and (3) the damages attributable to its leasing activities are severable from its other damages.

■ For its first argument, Woodmont relies on the "within this state" language of K.S.A. 58–3036 [8] and claims that "The Development Contract does not call for any alleg-edly offensive activity to be performed in Kansas. Therefore, it is up to the fact-finder to determine whether or not plaintiff engaged in the acts complained of in Kansas, and, if any, which of those acts should be severed for purposes of awarding plaintiff damages."

The court rejects this argument. K.S.A. 58–3036(c) clearly requires licensure for any person who agrees to negotiate, offer, attempt, or agree to negotiate the leasing of real estate (K.S.A. 58–3035(f)(3)), which is exactly one of the duties Woodmont agreed to undertake in the Development Contract. The leasing activities were pursuant to a contract governed by Kansas law, covering a project located in Kansas on property owned by a Kansas partnership. The fact that some (or even most) of Woodmont's leasing activities took place out of its Fort Worth, Texas office is irrelevant in view of what Woodmont agreed to do.[9]

■ Woodmont's second argument is that its leasing activities were not "for compensation" within the statutory [10] definition of "broker" because its fee under the Development Contract was "unaffected" by whether or not prospective tenants it contacted in Kansas actually signed leases.

The court likewise rejects this argument which, to be accepted, would require the court to adopt a strained and unrealistic construction of the statute and the Development Contract. Woodmont agreed to furnish or obtain from others leasing services for the shopping center. (Contract, ¶ 3.B, p. 15). For this and all the other things it agreed to do, Woodmont's fee was to be $650,000. The fact that Woodmont had the option to recruit outside real estate brokers whose commis-

---

**8.** *Licensure required.* Unless exempt from this act under K.S.A. 58–3037 and amendments thereto, no person shall:

(a) Directly or indirectly engage in or conduct or represent that such person engages in or conducts the business of a broker, associate broker or salesperson *within this state* unless such person is licensed as such a broker, associate broker or salesperson in accordance, with this act.

(b) Directly or indirectly act or represent that such person acts as a broker, associate broker or salesperson *within this state* unless such person is licensed as such a broker, asso-ciate broker or salesperson in accordance with this act.

(c) Perform or offer, attempt or agree to perform any act described in subsection (f) of K.S.A. 58–3035 and amendments thereto, whether as a part of a transaction or as an entire transaction, unless such person is licensed pursuant to this act. (emphasis added).

**9.** It is not irrelevant, however, on the "doing business" issues previously discussed.

**10.** K.S.A. 58–3035(f).

sions were to be paid by Rockwood (Contract, ¶6.B, p. 22) is irrelevant to what Woodmont agreed to do. Woodmont's leasing activities were contemplated by the contract and they were hardly "for free."

■ Accordingly, the court finds that Woodmont's contractual leasing obligations required it to have a broker's license. However, contrary to defendants' argument, Woodmont's failure to have a broker's license does not entirely bar Woodmont's lawsuit. Rather, the court accepts Woodmont's third argument and finds that Woodmont's leasing activities are severable under the contract.

A finding of severability is consistent with Kansas statute and Kansas case law. The statute upon which defendants rely for their "complete bar" position, K.S.A. 58-3038, *supra*, p. 9, does not say that an unlicensed person is *completely* barred from suing in Kansas. Rather, it says that no action can be instituted or recovery be had for compensation *for any service for which a license is required* unless the person seeking recovery is licensed. A broker's license was not required for many of the activities Woodmont agreed to undertake.

In *Thomas v. Jarvis*, 213 Kan. 671, 518 P.2d 532 (1974), upon which defendants place great reliance, the Kansas Supreme Court did hold, under the facts of that case, that failure to have a license barred recovery. *Id.* at 676, 518 P.2d 532. On appeal, the unsuccessful plaintiffs argued that even if they could not recover their commission for the portion of the sale price which represented real estate, they still should be entitled to recover their commission for the portion representing personalty. The Supreme Court, noting that plaintiffs had not raised their severance theory at trial, declined to consider severance on appeal. This court does not read *Thomas v. Jarvis* to indicate that where severance of contractual provisions *is* raised

at the trial level, recovery of *all* contractual sums will be barred merely because the party seeking to recover did not have a required license.[11]

■ Whether or not a contract is entire or divisible is a question of construction to be determined by the court according to the intention of the contracting parties as ascertained from the contract itself and upon a consideration of all the circumstances surrounding the making of the contract. *Blakesley v. Johnson*, 227 Kan. 495, 501, 608 P.2d 908 (1980).

Defendants urge the court to reject severance, relying on another Kansas case, *Brumm v. Goodman*, 164 Kan. 281, 188 P.2d 913 (1948). In *Brumm*, the parties entered into both an oral and a written contract. Under the *written* contract, plaintiffs agreed to lease a truck and trailer from defendants. Under the *oral* contract, defendants agreed to transfer *defendants'* ICC certificate, which plaintiffs apparently planned to use in a trucking business. The trial court found the written contract illegal but found the oral contract legal.

On appeal, the Supreme Court reversed. Certain portions of the ruling deserve quotation because they clearly explain the court's ruling:

No one may lawfully operate as an interstate motor common carrier without first obtaining a certificate from the interstate commerce commission authorizing such operation. In passing upon applications for such certificate, the commission give consideration to the financial responsibility of the applicant and to other such matters important to the public and as required by the law and the regulations. Obviously no holder of such a certificate can by contract or otherwise transfer the certificate to anyone else without approval of the interstate

---

11. In dicta, this court observes that the Supreme Court specifically noted that the purpose of Kansas' broker's licensing law is to protect the public from the fraud, misrepresentation and imposition of dishonest and incompetent persons. 213 Kan. at 675, 518 P.2d 532. *See also Stevens v. Jayhawk Realty Co.*, 9 Kan.App.2d 338, 344, 677 P.2d 1019 (1984) *aff'd* 236 Kan. 90, 689 P.2d 786. In the pretrial order, defendants make no such claims about Woodmont. Thus it is plausible to argue that faced with the facts in this case, the Supreme Court would find that Woodmont's failure to have a real estate broker's license would not bar its recovery of the value of its leasing activities. *See General Aggregate Corporation v. La Brayere*, 666 S.W.2d 901 (Mo.App. 1984).

commerce commission. It is as essential that the commission pass upon the qualifications of the transferee as it is in the case of the original applicant.

\*　　\*　　\*　　\*　　\*　　\*

[The] lease must be construed in connection with appellees' averments as to its purpose. Both the averments of the petition and testimony of the plaintiffs showed conclusively that the execution of the lease was an attempt to effect an arrangement under which they could begin operating the route before they had any authority to do so. The defendants held a certificate which the plaintiffs sought to secure. The plaintiffs owned a truck and alleged in the petition that they executed the lease of the truck to the defendants for the very purpose of permitting them to operate the truck under the certificate. On what theory anyone thought such a lease of the truck to the defendants would permit the plaintiffs to operate under the certificate prior to approval by the interstate commerce commission does not appear. Certainly it could have no such effect. There was no way in which the purpose of the contract could lawfully be carried out.

\*　　\*　　\*　　\*　　\*　　\*

We come to the question of whether the oral agreement to transfer the certificate was separable and enforceable in spite of the illegality of the contract otherwise. We think that both the allegations of the petition and plaintiffs' testimony show that it was one contract. In the petition the plaintiff specifically alleged that at the same time they entered into the oral contract and "as a part of said contract" they executed the written lease. There was no allegation of separate considerations. Plaintiffs' truck was leased to defendants

for the very purpose, however futile, of permitting them to begin operations without waiting for transfer of the certificate by commission.

\*　　\*　　\*　　\*　　\*　　\*

It would not be helpful, and would unduly extend this opinion to discuss various cases from among the countless number on the issue of separability of contract provisions, since each case must be decided upon the particular facts involved.

*Id.* at 282–285, 188 P.2d 913.

■ In *this* case, Woodmont agreed under the terms of the contract to do many things besides leasing. Unlike the circumstances present in *Brumm,* the contract contemplated many activities which were not "illegal" because they did not depend upon leasing and the requirement for a broker's license. *Cf. Morrison v. Bandt,* 149 Kan. 200, 202, 86 P.2d 480 (1939) (bargain remotely connected with an illegal purpose is not rendered illegal thereby if proof of the bargain could be made without relying on the illegal transaction). Indeed, the contract makes it clear (¶ 3, p. 15) that Woodmont did not have to engage in leasing itself. Rather, it could obtain leasing services from third parties and *defendants* agreed to be responsible for the payment of certain leasing commissions paid to third party brokers (¶ 6.B, p. 22). The undisputed facts are that Woodmont undertook some leasing but farmed out other leasing to third parties. Under these circumstances, the court finds that the leasing portions of the contract are severable and rejects defendants' argument that it is entitled to summary judgment on Woodmont's *entire* claim merely because Woodmont did not have a broker's license.[12]

**12.** Our holding is not in conflict with *Ellers, Oakley, et al. v. St. Louis Air Cargo,* 984 F.2d 1108 (10th Cir.1993). The court in *Ellers* denied recovery by *quantum meruit* as an alternative to recovery under breach of a contract claim of sums barred by the plaintiff's failure to have a certificate of authority to provide engineering services as required by Missouri law. The contract in that case not only spoke to services which clearly required the certificate of authority, but unlike this case, *all* the services contract-

ed for required a certificate. Severability was not an issue.

*Ellers* was decided under Missouri law but Kansas also follows the rule that there can be no *quantum meruit* recovery for services performed under an illegal contract. *Ridgway v. Wetterhold,* 96 Kan. 736, 737, 153 P. 490 (1915). Therefore, Woodmont's claim for *quantum meruit* recovery for the value of its leasing activities (Pretrial Order, p. 23) *is* barred.

### Woodmont's Misrepresentation Claim

■ Woodmont also makes a misrepresentation claim. The facts underlying its claim are that defendants promised to go ahead with the project despite their knowledge that they would receive a lesser amount of unrestricted loan proceeds than originally anticipated. In reliance on these representations, Woodmont alleges that it continued to pursue the project.

Defendants argue Woodmont has merely dressed up its breach of contract claim in different clothing and renamed it a misrepresentation claim. According to the defendants, Kansas law holds that where parties enter into a contract defining their respective rights and duties, extra contractual tort duties concerning the same subject matter are precluded.

The rule upon which the defendants rely was discussed in *Isler v. Texas Oil & Gas Corp.,* 749 F.2d 22 (10th Cir.1984). In *Isler,* the defendant owned an oil and gas lease that it farmed out to the plaintiff. The plaintiff later brought an action seeking to recover for the defendant's failure to make necessary rental payments which resulted in the expiration of the lease. The trial court entered judgment for the plaintiff on a negligence theory. The Tenth Circuit reversed. Relying upon the New Mexico Supreme Court's decision in *Rio Grande Jewelers Supply, Inc. v. Data General Corporation,* 101 N.M. 798, 689 P.2d 1269 (N.M.1984), the court found the jury's verdict infringed on the principle of freedom of contract, whereby parties bargain and voluntarily impose upon themselves certain duties and the consequences of the breach of those duties. *Id.* at 23. The court found the trial court had confused the concept of contractual duties with tort duties. Contractual duties are voluntarily bargained for, while tort duties are imposed by law on individual members of society without their consent. Applying those concepts to the case before it, the court held that any extra contractual tort duty regarding rental payments and notice was precluded because the contract specifically defined the rights and duties of the parties. *Id.* at 24.

The Kansas Supreme Court applied the reasoning of *Isler* in *Ford Motor Cred. Co. v. Suburban Ford,* 237 Kan. 195, 699 P.2d 992 (1985). In *Ford Motor,* the plaintiff sued the defendant for breach of contract. The defendants counterclaimed on a number of tort theories. Relying upon *Isler,* the Supreme Court held the submission to the jury of any tort claim for conduct by the defendants expressly allowed by the parties' contract was erroneous, as the parties' relationship was governed by their contract. *Id.* at 203–05.

If, as Woodmont alleges, the defendants did misrepresent their intention to perform and induced Woodmont to perform its duties under the contract, Rockwood would be in breach of its duties under the contract. The parties contemplated a remedy in such circumstances. The provisions of the development contract covered the consequences of a default by either party. The bargained-for existence of a contractual remedy displaces the imposition of a tort duties in this case. *Isler,* 749 F.2d at 24.

Defendants' motion for summary judgment (Doc. 87) is hereby granted as to Woodmont's misrepresentation claim, and denied as to all other claims.

In view of the extensive memoranda already filed by the parties, any motions for reconsideration of this order, as well as responses thereto, shall be limited to 10 pages, *including* any attachments and exhibits. No reply memoranda will be permitted.

IT IS SO ORDERED.